**Richmond**

LINDA ROTHWELL WESTBROOK

v.

WILLIAM E. WESTBROOK, JR.

WILLIAM E. WESTBROOK, JR.

v.

LINDA ROTHWELL WESTBROOK

Nos. 1019-86 and 1039-86

Decided January 19, 1988

448

COUNSEL

Terrence R. Batzli (Mays & Valentine, on brief), for Linda Roth-well Westbrook.

Edward D. Barnes, for William E. Westbrook, Jr.

OPINION

**COLE, J.** — Linda Rothwell Westbrook filed a bill of complaint in the Circuit Court of Hanover County on March 16, 1984, alleging that William E. Westbrook, Jr. deserted her on January 1, 1984. She sought a divorce on the ground of desertion. She also sought temporary and permanent spousal support, a monetary award under Code § 20-107.3, and an award of attorney's fees and costs. William filed an answer on March 22, 1984, asking that the bill of complaint be dismissed. On February 4, 1985, an amended bill of complaint was filed alleging William's adultery.

On April 19, 1985, the cause was referred to a commissioner in chancery, who, after an *ore tenus* hearing, filed his report on January 22, 1986. He found that a five acre parcel of real estate upon which was built a home known as the "Tavern" was the separate property of William; he also recommended a monetary award to Linda in the amount of $54,000, which included an attorney's fee in the amount of $7,500, the payment to be made by William in thirty-six equal monthly installments. Upon exceptions filed by both parties, the trial judge in the final divorce decree entered on July 29, 1986, affirmed the commissioner's report, except that he reduced the monetary award to $20,000, ordered William to pay counsel fees in the amount of $7,500, and to pay the commissioner's fee and all other costs incurred by Linda in the proceeding. Finally, he granted to Linda a divorce from the bond of matrimony upon the ground of willful desertion.

On appeal, Linda alleges that she is aggrieved by the final decree of divorce entered on July 29, 1986, and asks us to decide: (1) whether a writing dated November 9, 1983, was sufficient to convey legal and/or equitable joint ownership of the five acre parcel known as the "Tavern" to her; (2) whether she is a joint owner of the "Tavern" on the basis of an implied trust; and (3) whether the trial court arbitrarily reduced the monetary award to her as recommended by the commissioner in chancery. William also contends that he is aggrieved by the decree, claiming that: (1) the court erred in not striking Linda's case because she committed perjury; (2) the court erred in awarding attorney's fees to Linda; and (3) the court erred in making a monetary award. We find that the trial court erred in determining the five acre parcel was the separate property of William, but properly refused to dismiss Linda's suit because she committed perjury. We

reverse and remand.

Prior to their marriage on October 16, 1982, Linda, age 34, was a senior art director for a major advertising firm in Atlanta, Georgia. Her gross annual salary was approximately $44,000 and she earned additional sums doing "free lance" work. William was the sole stockholder in a successful advertising agency in Richmond, Virginia. They began dating in the spring of 1982 and by late summer decided to marry. Since William's two children by a previous marriage lived in the Richmond area, they decided that as soon as Linda's home in Atlanta was sold, they would marry and reside in Hanover County.

In 1981, prior to their marriage, William purchased, in his own name, a five acre parcel of land in Hanover County upon which was located a rustic three room cabin. They planned to erect a reproduction of a colonial tavern on the parcel and to use the tavern as their home. Pursuant to these plans, Linda sold her home in Atlanta and moved into the three room cabin with William.

After eleven months of marriage, in September, 1983, William advised Linda that he desired her to go with him to counseling in order that he might "find himself." At that time, one of William's friends had died and his sister had attempted suicide, and Linda perceived these events as the primary reasons behind the request for counseling. About a month later, William admitted to her that he had been seeing his former paramour who had caused the breakup of his first marriage, but reassured her that there was nothing to worry about. However, he suggested at that time that they see individual counselors. In late October, 1983, he told her that he wanted a separation.

In June, 1983, before most of their marital problems commenced, both parties signed an application for a construction loan in the amount of $150,000. The loan application contained a statement that the five acre parcel would be held in the names of William E. and Linda R. Westbrook as tenants by the entireties. In October, 1983, the parties were requested to fulfill the legal requirements of the loan to be used to construct the Tavern. Since William was married, the lending institution required Linda to sign the construction money note and deed of trust securing the note. Under the circumstances, Linda would not sign the note until an agreement was made concerning ownership of the real es-

tate. The parties discussed such an agreement, each contributing to its development, and the final draft, in William's handwriting, reads as follows:

11/9/83

Linda and I are building the tavern in Ashland together. She has agreed to obligate herself for the loan with me. So I agree we own the house together. In the event of my death before I can draw up a will to reflect the following, I hereby state it now. My intent is that Linda would get the tavern.

Bill Westbrook

After this agreement was signed by William, Linda signed the construction money note and deed of trust upon the real estate in the amount of $150,000 and the loan was secured. Construction was commenced upon the home. The commissioner reported that the fair market value of the Tavern was $275,000, with an outstanding mortgage in the amount of $112,000.

Linda claims that the writing dated November 9, 1983, conveyed to her legal and/or equitable joint ownership of the real estate, or made her a joint owner on the basis of an implied trust. Therefore, she submits that the real estate constituted marital property, not separate property of William. William maintains that the commissioner and the trial court properly decided that the real estate is his separate property.

Under our property law, "[n]o estate of inheritance or freehold or for a term of more than five years in lands shall be conveyed unless by deed or will." Code § 55-2. Since the writing dated November 9, 1983, is neither a deed nor a will, it did not convey legal title or joint ownership of any kind to the real estate. We hold that under the terms of the agreement, Linda did not acquire any legal title or joint ownership of the five acre parcel.

Linda also asserts that the agreement made her a joint owner of the five acre parcel on the basis of an implied trust. She did not make this argument before the trial court. Therefore, we will not consider it on appeal. Rule 5A:18.

Our Equitable Distribution Act (EDA) requires that property be classified according to when it was acquired. This places great

importance upon the concept of acquisition since the acquisition date is not always clear. It is uncontested that William owned and paid for the five acre tract prior to the marriage. Therefore, we have no acquisition issue presented in this case.

■ Code § 20-107.3(H) provides that the EDA shall not be construed to prevent the affirmation, ratification and incorporation in a decree of an agreement between the parties pursuant to Code §§ 20-109 and 20-109.1. Code § 20-109 provides that where the parties have entered into a valid contract, "no decree or order directing the payment of support and maintenance for the spouse, suit money, or counsel fee or establishing or imposing any other condition or consideration, monetary or nonmonetary, shall be entered except in accordance with that stipulation or contract." (emphasis added).

■ In *Parra v. Parra*, 1 Va. App. 118, 336 S.E.2d 157 (1985), the parties entered into a settlement agreement providing for the sale of the marital home and disposition of the proceeds. The wife failed to acquiesce in the sale of the home, asserting that the agreement could not be enforced because it was not incorporated into the divorce decree. We held that Code §§ 20-107.3(H) and 20-109 must be read together and, where the parties reach an agreement, the trial court may not decree a monetary award that is inconsistent with it. *Parra*, 1 Va. App. at 128, 336 S.E.2d at 162-63.

■ Upon dissolution of a marriage, public policy favors a prompt resolution of the property rights between the parties. *Morris v. Morris*, 216 Va. 457, 459, 219 S.E.2d 864, 867 (1975). "Voluntary, court-approved agreements promote that policy and should be encouraged." *Id*. The beneficial purpose of such agreements would be diminished if the parties to the agreement knew that they could breach the agreement with impunity, anticipating that they might get more favorable treatment from the courts. *Parra*, 1 Va. App. at 129, 336 S.E.2d at 163.

In the case before us, the parties voluntarily agreed upon the writing dated November 9, 1983. All of the essential elements of a valid contract are present in the writing: competent parties, legal subject matter, valuable consideration and mutual consent. 4B Michie's Jurisprudence *Contracts* § 24 (1986). The terms of the agreement are clear. Linda agreed to obligate herself by signing a

promissory note in the amount of $150,000 to be used as construction money to build the Tavern. She fulfilled her part of the bargain. William agreed that they were to own the house together. When William was questioned about the statement "I agree we own the house together," his response was, "It's my understanding that in Virginia that, you know, that's marital property." William further stated his intention in the writing to give the home to Linda by will at his death. His statement of intention to will the home to Linda is not a fixed commitment, but he is bound by the terms of the first part of the writing.

We find that the writing dated November 9, 1983, constituted an agreement between the parties to change the status of the real estate from separate to marital property. In consideration for this change in status, Linda signed the note in the amount of $150,000 which was used to obtain the construction money. We hold that, upon the signing of the writing by William and performance by Linda when she executed the note and deed of trust, this property became marital property.

Code § 20-107.3(H) provides that the parties may make their own arrangements concerning the division of property.[1] This type of property settlement agreement is often referred to as "an opting out agreement." Other states have provisions permitting the parties to "opt out" of the statutory provision regarding marital and separate property by entering into a valid property settlement agreement. 1 J. McCahey, *Valuation and Distribution of Marital Property* § 18.07(3)(b) (1984). "Thus, in most jurisdictions provision is made for the characterization by the parties of their property as separate or marital by virtue of this entering into an agreement." *Id.*

██ Transmutation is the change of the characteristic of property from nonmarital to marital. "This transformation may be effected by an agreement between the parties or by the affirmative act or acts of the parties." *Id.* at § 18.07(1). The Supreme Court of Virginia adopted the doctrine of transmutation in *Smoot v.*

---

[1] Effective July 1, 1987, Code §§ 20-147 to 154 govern marital agreements entered into between parties. Code § 20-155. These agreements must be in writing and signed by both parties and are enforceable without consideration. Code § 20-149. Written agreements entered into prior to the effective date are valid and enforceable if otherwise valid as contracts. Code § 20-154.

*Smoot*, 233 Va. 435, 442, 357 S.E.2d 728, 731 (1987), holding that "when . . . a spouse fails to segregate and instead, commingles, separate property with marital property, the chancellor must classify the commingled property as marital property subject to equitable distribution." In *Price v. Price*, 4 Va. App. 224, 236, 355 S.E.2d 905, 912 (1987), we held that transmutation occurred where the parties commingled separate and marital property to create a "new" piece of property. We now find that this same transmutation occurs when the parties make an agreement that separate property shall be marital property. *See* L. Golden, *Equitable Distribution of Property* § 5.33 n. 204 (1983). Because the parties treated the Tavern as marital property and expressed an intent that it be treated as such in the November 9, 1983, writing, the Tavern was transmuted to marital property. Therefore, the trial court erred when it held the Tavern was William's separate property. Our holding does not mean that the husband will not benefit from his original purchase of the property and the improvements that he may have made to the property before November 9, 1983. It means that the property will be classified and valued as marital property and will be included among all of the marital assets when the trial judge determines the monetary award, if any, in accordance with the eleven factors set forth in Code § 20-107.3(E). Enlarging the pool of marital assets available for the trial court to fix the monetary award should permit it to make a more equitable award.

We now consider whether the trial court arbitrarily reduced the monetary award to Linda from $54,000, including an attorney's fee of $7,500, as recommended by the commissioner, to $20,000. Neither the commissioner nor the trial judge gave any explanation of the basis for the award. Code § 20-107.3(D) requires that the monetary award be "based upon the equities and the rights and interests of each party *in the marital property*." (emphasis added). *See Smoot*, 233 Va. at 442, 357 S.E.2d at 731 (1987). We conclude, however, that it is not necessary to determine whether the trial judge acted properly in reducing the marital award since on remand the award must again be calculated considering the Tavern as marital property.

Since several issues raised by William on his appeal will again confront the trial judge upon retrial, we will address them in this opinion. William contends that the trial judge erred when he re-

fused to strike Linda's evidence because she committed perjury. In her discovery deposition taken on March 23, 1985, Linda denied having sexual relations with any other man during the marriage. At the commissioner's hearing held on May 10, 1985, she admitted that she had not told the truth at her discovery deposition and that she had sexual relations with another man during the marriage, but well after the separation of the parties on January 1, 1984. To justify her untruthfulness, Linda explained that in late October and November, 1983, William renewed his adulterous relationship with his paramour, and that on January 1, 1984, he deserted Linda to live with her. She believed the fact that she, at a later date, had a relationship with a man had nothing to do with the breakup of the marriage, and was, therefore, irrelevant to the proceeding. Under the circumstances, the defense of recrimination was available to her.

The commissioner, in response to a specific inquiry from the court, reported that the "[h]usband's desertion of wife in order to resume his relationship with [his paramour] is the primary factor contributing to the dissolution of the marriage." The husband did not except to this finding. The wife excepted to it for the reason that it did not include both the husband's desertion and adultery. The record adequately supports the finding of the commissioner that William's misconduct was the cause of the dissolution of the marriage.

William asserts that it is a well established principle of equity that "he who comes into equity must come with clean hands." He further asserts that since Linda falsely testified in the depositions about her relationship with another man, believing that the court's knowledge of this relation would diminish her chances for a favorable monetary award, her bill of complaint should be dismissed. We disagree with this argument.

 The Virginia Constitution authorizes the General Assembly to confer upon the courts power to grant divorces. Va. Const. art. IV, § 14. Therefore, the power to grant divorces in Virginia is purely statutory. *White v. White*, 181 Va. 162, 166, 24 S.E.2d 448, 450 (1943). Divorce cases are generally considered equity cases because Code § 20-96(A) provides that the circuit courts, on the chancery side, shall have jurisdiction for annulling or affirming marriage and for divorces. Although this statute places divorce cases on the chancery side of the docket, "[t]he many lim-

itations, both in respect to jurisdiction and procedure, placed upon divorce suits by the statute, differentiate the divorce case from ordinary suits in equity and render it a chancery case *sui generis.*" *McCotter v. Carle,* 149 Va. 584, 593, 140 S.E. 670, 673 (1927). "Such jurisdiction is generally termed a limited statutory jurisdiction." *Id.* (citation omitted).

The "clean hands doctrine" is one of many equitable principles and maxims that apply to equity suits. Others include "he who seeks equity must do equity;" "equity considers as done that which ought to be done;" "equality is equity;" "equity aids the vigilant;" and "equity looks to the substance of things and not to mere form." *See* 7A Michie's Jurisprudence *Equity* §§ 16-25 (Repl. Vol. 1985). "Equity does not have jurisdiction of cases in which the plaintiff has a full, complete, and adequate remedy at law, unless some peculiar feature of the case comes within the province of a court of equity." *Id.,* § 10. The usual grounds of equitable jurisdiction are accident, mistake, relief against penalties, accounts, fraud, discovery, trust, specific performance, injunctions, contributions, substitution, want of an adequate remedy at law, and jurisdiction conferred by statute. *Id.,* § 7.

Our research discloses that it is an unresolved question whether the equitable maxims applicable to equitable jurisdiction apply to divorce cases which are purely statutory. The cases cited by William in support of the applicability of the "clean hands doctrine" to this case are easily distinguishable. In *Brown v. Kittle,* 225 Va. 451, 303 S.E.2d 864 (1983), cited by William, the trial court refused to award a father custody of his child, ruling that he had come into court with "unclean hands." The Supreme Court of Virginia reversed this decision, holding that in child custody cases, the welfare of the child is paramount. The court further held that it would not invoke the "clean hands doctrine" where the result would prejudice the rights of the children. *Id.* at 457, 303 S.E.2d at 867-68. Another case upon which William relies is *McNeir v. McNeir,* 178 Va. 285, 16 S.E.2d 632 (1941). This case is not a suit to obtain a divorce or determine property rights, but is an equity suit brought to declare null and void a Nevada divorce decree because of lack of jurisdiction over the parties based upon "false and fraudulent misrepresentations and testimony." The court applied the "clean hands doctrine," holding that the complainant chose the jurisdiction and could not profit by her own

wrong. *Id*. at 290-91, 16 S.E.2d at 633.

We do not find it necessary to decide whether the "clean hands doctrine" is applicable to divorce cases since no issue has been raised in this case concerning the grounds of divorce, custody of children, or spousal or child support. Rather, the only issue relates to a monetary award under Code § 20-107.3. Therefore, our decision is narrowly confined to this area.

Code § 20-107.3(A) provides that the trial court shall "consider which of such property [real and personal] is separate property and which is marital property." It further provides that after making this division, the court may grant a monetary award to either party "[b]ased upon the equities and the rights and interests of each party in the marital property." Code § 20-107.3(D). Notably, this is a mandatory duty placed upon the trial judge by statute, and does not provide for any equitable considerations such as the "clean hands doctrine" or other equitable maxims applicable to suits in equity.

Upon a finding that a monetary award "[b]ased upon the equities and the rights and interests of each party in the marital property" is proper, the trial judge must determine the amount of the award after consideration of the eleven factors set forth in Code § 20-107.3(E). Neither the equitable maxims nor perjury are included among the factors to be considered. However, the circumstances and factors which contributed to the dissolution of the marriage, specifically including any ground for divorce, are among the factors to be considered in determining the amount of the award. The statute authorized the commissioner and the trial judge to weigh these circumstances as a factor in arriving at the amount of the monetary award. Obviously, the commissioner considered these circumstances since he reported that William's desertion of Linda in order to resume his relationship with his paramour was the primary factor contributing to the dissolution of the marriage.

In the present case, we hold that the "clean hands doctrine" is unavailable to a party when it is asserted in the context of equitable distribution proceedings. Just as the court in *Brown* refused to apply the "clean hands doctrine" in custody cases where the interests of children would be prejudiced, we refuse in this case to apply the "clean hands doctrine" in making a mone-

tary award where the purpose and intent of Code § 20-107.3 would be thwarted. The wife's untruthfulness regarding her sexual relations has no bearing upon the determination of what property is marital or separate, or upon the equities and the rights and interests of each party in the marital property. Therefore, the trial court acted properly in refusing to dismiss the wife's suit on such grounds.

Upon retrial, the chancellor must again address the issues of attorney's fees and court costs. In the final divorce decree, he granted to Linda attorney's fees in the amount of $7,500. William contends that the amount of counsel fees awarded is excessive. There is no evidence in the record to explain or justify the amount of the award. Absent such a showing, we cannot sustain an award of counsel fees. *Robertson v. Robertson*, 215 Va. 425, 429-30, 211 S.E.2d 41, 45 (1975). We have said that "the key to a proper award of counsel fees . . . [is] reasonableness under all of the circumstances revealed by the record." *McGinnis v. McGinnis*, 1 Va. App. 272, 277, 338 S.E.2d 159, 162 (1985). Where the trial judge finds that a fee award is justified, evidence of time expended and services rendered is a proper basis upon which to fix an award. *Id.* We have said, however, "[a] trial court is not unmindful of the usual charges within its jurisdiction, and . . . a relatively modest award may be found to be reasonable." *Id.* Upon remand, the question of counsel fees should be reexamined and the amount fixed from a proper showing of what is reasonable upon all of the circumstances existing at the time.

Accordingly, the judgment below is reversed and this cause is remanded for further proceedings consistent with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*

Baker, J., and Duff, J., concurred.