COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, Felton and Senior Judge Annunziata[*]
Argued at Alexandria, Virginia


CAROL M. RANNEY

                                                              OPINION BY
v.       Record No. 0979-04-4                    JUDGE ROBERT J. HUMPHREYS
                                                              FEBRUARY 1, 2005
TIMOTHY RANNEY


               FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                            Arthur B. Vieregg, Judge

           Paula W. Rank (Byrd Mische, P.C., on briefs), for appellant.

           Raymond D. Battocchi (Gabeler Battocchi Griggs & Powell, PLLC,
           on brief), for appellee.


       Carol M. Ranney ("wife") and Timothy Ranney ("husband") have each appealed an

equitable distribution award entered pursuant to their no-fault divorce.  Wife contends that the

trial court erred in the classification and valuation of the marital property, and she also argues

that the court abused its discretion in the distribution of the marital estate.  Husband, in a

separate appeal, contends that the trial court erred in failing to reduce wife's equitable

distribution award based on her fraudulent inducement of the marriage.[1]  For the reasons that

follow, we hold that the trial court did not err in either its classification of the property or the

distribution of the marital estate, and we therefore affirm the judgment of the trial court.


_____

       [*] Judge Annunziata participated in the hearing and decision of this case prior to the
effective date of her retirement on December 31, 2004 and thereafter by her designation as a
senior judge pursuant to Code § 17.1-401.

       [1] See Ranney v. Ranney, Record No. 1051-04-4 (2004) (Va. Ct. App. Feb. 1, 2005).

## I. BACKGROUND

Wife and husband married on April 11, 1998. Although this was wife's fifth marriage, wife indicated on the parties' marriage certificate that she had only been married once before.[2] Throughout the first three years of the marriage, husband continued to believe that this was only wife's second marriage. In June 2001, however, husband discovered that wife had, in fact, been married at least twice before. At that point, husband broke off all sexual contact with wife. On April 5, 2002, after husband discovered that wife had actually been married four times before, the parties separated.

Wife filed a Bill of Complaint, seeking a divorce on the fault-based ground of desertion. In January 2003, husband filed a Cross-Bill, alleging post-separation adultery. In light of allegations that both parties were dissipating marital assets, the trial court entered a decree freezing the marital estate.

On March 25, 2003, husband filed a separate action at law, alleging that wife committed actual fraud by "induc[ing] [husband] to marry her through a carefully calculated scheme to defraud." Husband requested compensatory damages consisting of "the more than $500,000 in extravagant expenditures [wife] made during the marriage with money [husband] earned, and the more than $250,000 he paid to compensate [wife] for money she lost in the stock market." Husband also requested an award of punitive damages in the amount of $1,000,000. The trial court in that proceeding granted wife's demurrer, noting that the fraud allegations would be "completely cognizable within the context of the divorce" proceedings and that "the judge in the equitable distribution case can adjust the equitable distribution to address the equities."

---

[2] Although she never attended college, wife also told husband before the marriage that she had received a college education.

- 2 -

Husband then sought to amend his answer to wife's Bill of Complaint, requesting permission to add a fraudulent inducement claim. The trial court denied that motion.

A. The Commissioner's Report

A commissioner in chancery conducted an evidentiary hearing on October 16, 2003. In the commissioner's report, issued after the hearing, the commissioner found that "[husband] deserted [wife] and the marriage on April 5, 2003 [sic] with the intention to remain away permanently, and that such intention has continued to the present time." The commissioner also noted, "[Wife] admitted that she committed adultery."

The commissioner observed that, once husband learned in June 2001 "that [wife] had more than one prior marriage, he broke off all sexual contact with [wife]." The commissioner additionally acknowledged that "the parties may not have had much of a sex life with each other prior to June, 2001."

The commissioner also found that, "during the prior three years of the marriage [husband] had earned over $4,000,000, and that the parties had spent money lavishly, and that large sums were spent unilaterally by each of them." The commissioner noted that, "[d]uring the period both before and after [husband's] income ceased, the parties had argued over money."

The commissioner additionally found that, "[a]t the time of the marriage in April, 1998 and for most of the subsequent period prior to the separation, [wife] failed to disclose that she had been married four times previously, rather than only one time as indicated on their marriage record." The commissioner observed:

> There is a substantial difference between marrying someone with one former marriage and marrying someone with four. At the very least, the difference is important enough that the other party should have the right to know, to try to understand, and to decide whether to go ahead with the relationship. [Wife] made a material misrepresentation on her marriage certificate, and the Commissioner believes the [husband's] testimony that he did not

- 3 -

know at the time of their marriage, and for three years thereafter, that she had more than one prior marriage.

The commissioner, however, declined to hold that wife's misrepresentations about her prior marriages justified husband's desertion, noting that, "[a]lthough this may have been a ground for annulment on the basis of fraud had it been discovered in a timely manner and pursued as such, there is no basis in the Virginia case law for treating this as continuing legal justification for his departure in a divorce action."

Based on these factual findings, the commissioner concluded that three factors led to the dissolution of the marriage: (1) disagreements over financial decisions; (2) sexual matters; and (3) wife's continued active concealment of three of her four prior marriages. As to the disagreements about finances and the sexual matters, the commissioner found that, on both of these matters, "there may be some blame to be attributed to each party, but it would not be appropriate to single out just one party." The commissioner then observed that wife's "most serious fault during the marriage was her continued active concealment of three prior marriages during the three year period when she was enjoying the benefits of the [husband's] then very substantial income." Ultimately, the commissioner left "it to the Court as to what weight to give this matter in regard to the financial issues . . . since the Commissioner's findings on this point need to be considered in the context of all of the other evidence, and especially the financial evidence, to be reviewed at the trial."[3]

---

[3] On the issue of spousal support, the commissioner found that "[t]he party seeking to avoid payment of spousal support (the [husband]) has proved adultery on the part of the [wife] and is himself guilty of desertion." However, the commissioner declined "to make a recommendation as to whether these technical fault grounds recriminate each other so as to erase both grounds." The commissioner also noted that "[wife's] adultery, being post-separation and having nothing to do with the breakup of the marriage, may not of itself be so serious as to justify a denial of spousal support," concluding that

- 4 -

Ultimately, the commissioner recommended that the trial court award wife a divorce *a vinculo matrimonii* on the grounds of marital separation for a period in excess of one year. The commissioner did not recommend granting the divorce on grounds of desertion, reasoning that "even though [husband's] reasons for leaving on April 5, 2002 technically do not constitute legal justification, they are nevertheless understandable under the circumstances." The commissioner also recommended "the divorce not be granted on the ground of adultery," reasoning that the adultery "was post-separation and there is absolutely nothing to indicate that it had anything to do with the breakup of the marriage."

### B. The Equitable Distribution Proceedings

The trial court conducted an equitable distribution hearing in October 2003. By letter opinion issued on March 4, 2004, the trial court issued its factual findings, classified and valued the parties' assets, and divided the marital property.

In its letter opinion, the trial court found that husband "earned more than $6.3 million in stock options and salary" during the marriage and that wife "came into the marriage with almost $600,000." Also, the court observed that husband "had debts approximating $400,000" at the start of the marriage and that "[t]hose debts were paid off in the course of the marriage." The court further noted that, "[d]uring their first year of marriage the parties principally lived off of [husband's] salary." However, because of a prior disability settlement, wife "had significant funds at her disposal."

---

> [w]hether [wife's] marital fault in failing to disclose the number of her prior marriages at the time of the marriage and continuing to conceal this information is such fault as would be relevant in a consideration of manifest injustice is a matter that the Commissioner chooses to leave to the Court without any recommendation.

Ultimately, however, neither party requested an award of spousal support.

The court also found that neither party made significant non-monetary contributions to the marriage, observing that wife "made scant non-monetary contributions to the marriage" and that husband "similarly made some, but few non-monetary contributions." The court additionally found that

> The evidence persuasively demonstrates that while [wife] was solicitous of [husband's] affections before the marriage, once married her conduct changed. She became largely self-absorbed, dominating, and often threatened divorce. During the marriage, [husband] was principally devoted to his work, lived modestly, and financed his wife's lavish shopping and expenditures without significant objection.

Moreover, the trial court expressly "found [wife's] testimony, unless wholly corroborated, was generally not worthy of belief." By contrast, the court "found [husband's] testimony, though uncorroborated, generally credible."

The court's findings as to the specific property subject to this appeal are discussed in more detail below.

### 1. The Stock Options

In March 1998, approximately one month before the parties' marriage, husband entered into an employment contract with Network Solutions. As part of that employment contract, husband received 25,000 stock options that were scheduled to vest at various times over the next four years. Of those options, 20,000 were contingent only upon husband's continued employment, with thirty percent to vest at the end of the first year of employment, thirty percent after the second year, twenty percent after the third year, and the final twenty percent after the fourth year. The remaining 5,000 stock options were contingent on the "achievement of certain business production milestones."

During the course of his employment, husband "was awarded the additional 5,000 stock options." Beginning in 1999, the parties began selling husband's stock options. Although

husband "produced no documentary evidence confirming when he received or exercised any of the Network Solutions stock options issued to him . . . [h]e also testified he had received over $6.3 million from the sale of stock options and salary from which, after taxes, he had realized about $3.5 million." Husband's employment was terminated in July 2001 after Network Solutions was purchased by another company.

The trial court found that husband "was awarded, but not necessarily issued, the 20,000 Network Solutions options before the parties' marriage." Thus, the court concluded that the 20,000 stock options were husband's separate property because he "acquired" those options prior to the marriage. The court also found, however, that husband failed to prove that the additional 5,000 stock options – which were not awarded until after the marriage – were his separate property, and therefore classified those options as marital property.

## 2. The Land in South Carolina and the SeaRay Boat

During the course of the marriage, the parties purchased unimproved land in South Carolina with a stipulated value of $975,000. The parties also purchased several boats, including a twenty-nine foot SeaRay boat valued at approximately $63,000. Both the South Carolina land and the SeaRay boat were jointly titled in both parties' names.

The court found that, although husband's earnings "ultimately financed the purchase of . . . the South Carolina land, the evidence also indicates that some portion of the South Carolina land down payments and maritime purchases were made either with [wife's] funds or were borrowed and secured for a time by her accounts." The court further noted, however, that "[t]he credible evidence also reflects that [husband] either paid off the loans secured by wife's assets or deposited moneys used from his wife's accounts for these purposes. The source of these payments and deposits were his stock option proceeds."

- 7 -

Thus, the court found that, although husband "testified, in a conclusive fashion," that the South Carolina property and the SeaRay boat "had been purchased with the proceeds from the sale of his Network Solutions stock options," the totality of the evidence "showed that, in addition to his stock option sales proceeds, the parties had other available marital assets to purchase the contested assets." The court noted that, because these assets were purchased during the marriage, husband had the burden of proving that they were his separate property, concluding that husband's evidence was insufficient to carry that burden. Accordingly, the court classified these assets as marital property.

### 3. The Morgan Stanley Stock Accounts

During the marriage, the parties established three stock trading accounts with Morgan Stanley. The first account, deemed the "Campbell Account," was titled solely in wife's name, and it contained approximately $121,000. The trial court found that this account was wife's separate property and, therefore, not subject to equitable distribution. The second account, deemed the "Rohrer Account," was jointly-titled in both parties' names, and it contained approximately $32,000. A third account, deemed the "money market" account, was also jointly-titled in both parties' names, and it contained approximately $14,000. The trial court classified both the second and third accounts as marital property, and it awarded both of these accounts to husband.

### 4. Division of the Marital Estate

After classifying the marital assets, "considering each of the factors contained in [Code § 20-107.3(E)]," and "considering all of the circumstances of the parties," the court awarded husband $1,344,868.84 in marital property and awarded wife $677,453 in marital property. Thus, husband received approximately two-thirds of the marital estate, and wife received approximately one-third of the marital estate.

The court also ordered that husband "be awarded any tax write-offs to which the parties might be entitled." The court further noted that "[t]hese awards are . . . inclusive of findings that [husband] committed waste, both in the sale of the gold coins shortly before trial and dissipation of the assets from the E-Trade Account amounting to $259,000, and assumes [wife's] entitlement to half the value of those assets, or $129,500."

In reaching its decision, the court observed that:

> After taking into account all of the evidence . . . it is apparent that this marriage was of short duration. Moreover, it was a marriage in which both parties were personally absorbed by pursuit of financial gain: [Husband] by pursuing his career with Network Solutions and later Verisign; [wife] by trading in the stock market. [Wife] otherwise engaged in lavish expenditures, including spending on clothes and in architectural planning for a luxurious home in South Carolina. It is apparent that [wife's] premarital assets afforded liquidity to the marriage, before [husband] began receiving and cashing in his Network Solutions stock options. I also find that [wife's] stock market trading eventuated in significant but un-quantifiable losses. On balance, I conclude that the diminution of [wife's] premarital assets is offset by the expenditure of [husband's] salary and stock options to her benefit during the marriage.

On April 2, 2004, the trial court entered a final decree granting wife a divorce on the ground that the parties had lived separate and apart for more than one year. The parties appeal from this ruling.

## II. ANALYSIS

On appeal, wife contends that the trial court erred in the classification and valuation of various property. Specifically, wife argues that the trial court erred in classifying: (1) husband's stock options as his separate property; (2) the property in South Carolina and the boat as marital property rather than wife's part-separate property; and (3) wife's stock account as marital property rather than wife's separate property.

- 9 -

Both parties contend that the trial court abused its discretion in distributing the marital estate. Wife argues that the court erred by: (1) failing to adequately consider that husband dissipated $250,000 in marital assets in anticipation of divorce; (2) failing to adequately consider that wife made substantial monetary contributions of her separate property to the marriage and toward husband's separate debt; (3) awarding husband all the future carry-over stock losses for tax purposes despite finding that the stock accounts were marital property; and (4) improperly considering wife's fraudulent inducement of the marriage. Husband, in contrast, contends that the trial court abused its discretion by failing to adequately consider wife's fraudulent inducement of the marriage.

For the reasons that follow, we hold that the trial court did not err in either the classification of property or the distribution of the marital estate, and we therefore affirm the judgment of the trial court.

### A. Classification of the Marital Property

On appeal, we view the evidence in the light most favorable to the prevailing party. Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003). Also, we "do[] not retry the facts, reweigh the preponderance of the evidence, or make [our] own determination of the credibility of witnesses." Moreno v. Moreno, 24 Va. App. 190, 195, 480 S.E.2d 792, 795 (1997). Rather, "[w]here, as here, the court hears the evidence *ore tenus*, its findings are entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Alphin v. Alphin, 15 Va. App. 395, 399, 424 S.E.2d 572, 574 (1992). Because the trial court's classification of property is a finding of fact, that classification will not be reversed on appeal unless it is plainly wrong or without evidence to support it. McDavid v. McDavid, 19 Va. App. 406, 407-08, 451 S.E.2d 713, 715 (1994); Srinivasan v. Srinivasan, 10 Va. App. 728, 732, 396 S.E.2d 675, 678 (1990).

The equitable distribution statute defines "separate property" as "all property, real and personal, acquired by either party before the marriage." Code § 20-107.3(A)(1)(i). "Marital property," in turn, encompasses "all property titled in the names of both parties," as well as "all other property acquired by each party during the marriage which is not separate property." Code § 20-107.3(A)(2)(iii). Property acquired during the marriage is presumptively marital property, unless shown to be separate property. See id.; see also Rahbaran v. Rahbaran, 26 Va. App. 195, 209, 494 S.E.2d 135, 142 (1997); Barnes v. Barnes, 16 Va. App. 98, 104, 428 S.E.2d 294, 299 (1993) ("[P]roperty acquired during the marriage is presumed to be marital and property acquired before marriage is presumed to be separate."). Also, the party contending that property acquired during the marriage is separate property bears the burden of proving that the property was acquired "for or from the proceeds of the sale of separate property." See Code § 20-107.3(A)(1); see also Courembis v. Courembis, 43 Va. App. 18, 34, 595 S.E.2d 505, 513 (2004) ("The party claiming that property acquired during the marriage is separate property bears the burden of rebutting this presumption.").

The equitable distribution statute also allows for the classification of certain property as "hybrid," or part-marital, part-separate. See Code § 20-107.3(A)(3). Property may be classified as hybrid when, *inter alia*, "marital property and separate property are commingled into newly acquired property resulting in the loss of identity of the contributing properties," but only if "the contributed property is not retraceable by a preponderance of the evidence and was not a gift." Id. Otherwise, "the commingled property shall be deemed transmuted to marital property." Id.

### 1. Stock Options

Wife initially contends that the trial court erred in classifying the stock options as husband's separate property. Wife argues that, because husband's ability to exercise the stock

options was contingent upon his continued employment, any options that vested during the marriage constitute marital property. We agree.

As noted in Dietz v. Dietz, 17 Va. App. 203, 436 S.E.2d 463 (1993), stock options made contingent on continued employment are akin to "deferred compensation." Id. at 215, 436 S.E.2d at 470. The equitable distribution statute provides that the "portion of the total interest, the right to which was *earned* during the marriage and before the last separation of the parties" from "any pension, profit-sharing, or *deferred compensation plan* or retirement benefit," constitutes marital property. Code § 20-107.3(A)(3)(b) & 20-107.3(G) (emphases added).

Here, husband could not exercise the stock options described in his employment contract until after he had remained with Network Solutions for a specified length of time. With the exception of the first month, the entire term of husband's employment with Network Solutions occurred during the parties' marriage. Because the condition necessary for the vesting of husband's right to exercise the stock options (i.e., his continued employment) was not fulfilled until after the parties' marriage, husband "earned" the right to exercise the stock options "during the marriage." See Cirrito v. Cirrito, 44 Va. App. 287, 605 S.E.2d 268 (2004) (holding that money received in exchange for complying with a non-competition agreement was marital property even though the agreement was signed before the marriage, rejecting the husband's argument that he "earned [the] money as soon as he signed the contract" because, "[a]lthough the agreement was negotiated prior to the marriage, the right to receive payment was contingent upon the husband not engaging in a particular business in the future" and that, "[w]hile married, husband fulfilled this obligation"). Accordingly, the stock options should have been classified as marital property, and the trial court clearly erred in classifying the options as husband's separate property. See id.

We also hold, however, that this error was harmless. As husband notes, the trial court found that husband "had not sustained his burden of proving that substantial assets acquired during the marriage could be traced to the proceeds of his stock option sales." As a result, the trial court classified all of the assets that were purchased with proceeds from the sale of the stock options (including any bank accounts that may have retained funds from the sale of those options) as marital rather than separate property. Husband has not appealed this finding. Because the misclassification of the stock options therefore constitutes harmless error, we will not reverse on this ground.

### 2. The South Carolina Property and the SeaRay Boat

Both the SeaRay boat and the South Carolina property were acquired during the parties' marriage. Thus, both of these assets are presumed to be marital property. Barnes, 16 Va. App. at 104, 428 S.E.2d at 299. Wife, however, contends that the trial court should have classified these assets as her part-separate property. Wife argues that she paid, from her separate account, the $545,985.04 purchase price of the South Carolina property as well as $87,193 of the purchase price of the SeaRay boat. Because a portion of the funds used to purchase these assets may have come from her separate account, wife contends that the trial court therefore "erred in classifying both items of property as completely marital." We disagree.

To prove that either the SeaRay boat or the South Carolina property were her part-separate property, wife had the burden of producing evidence sufficient to establish, by a preponderance of the evidence, that "the claimed separate portion is identifiably derived from a separate asset." Rahbaran, 26 Va. App. at 208, 494 S.E.2d at 141. If the party claiming a separate interest in property acquired during the marriage fails to provide sufficient tracing evidence, an asset purchased with both marital and separate funds "shall be deemed transmuted to marital property." Code § 20-107.3(A)(3). Thus, "even if a party can prove that some part of

- 13 -

an asset is separate, if the court cannot determine the separate amount, the unknown amount contributed from the separate source transmutes by commingling and becomes marital property." Rahbaran, 26 Va. App. at 208-09, 494 S.E.2d at 141 (internal quotations omitted).

Here, husband and wife presented conflicting evidence as to the source of the funds used to purchase the South Carolina property and the SeaRay Boat. As to the South Carolina property, wife testified that "money was borrowed against [her] account for the down payment and then it was repaid during the marriage." Wife also testified that the remaining funds used to purchase the property came from both her separate account and the proceeds from the sale of husband's stock options. Husband, however, testified that no money was actually taken out of wife's separate account for the purchase of the South Carolina property. Rather, he testified that all three of the Morgan Stanley accounts were used as collateral for a loan, and the loan was then used to purchase the property. Husband additionally testified that he paid off the loan from the sale of his stock options and that he reimbursed the Morgan Stanley accounts in full.

As to the SeaRay Boat, wife testified that the $10,000 down payment was paid from her separate Merrill Lynch account. Wife also testified that the remaining funds used to purchase the boat came from both the parties' jointly-titled bank account and funds that wife had deposited into the jointly-titled Morgan Stanley stock accounts. Husband, however, testified that the down payment on the boat was made from the loan collateralized by the Morgan Stanley accounts. Husband also testified that the remaining funds used to purchase the SeaRay Boat were derived from the sale of his stock options.

In its letter opinion, the trial court noted that wife's "testimony, such as it was, conflicted with [husband's]." Although husband "testified, in a conclusive fashion, that the [assets] had been purchased with the proceeds from the sale of his Network Solutions stock options," wife "assert[ed] that her funds were the source for acquiring . . . [these] assets." The court, in

- 14 -

resolving this conflicting testimony, observed that "[t]he evidence considered globally . . . makes plain that [husband's] stock options must have been the source of most of the monies necessary to acquire the disputed assets." The trial court also noted, however, that the money used to purchase these assets could have come from multiple other sources, including wife's separate account, the loan collateralized by the Morgan Stanley accounts, the parties' various joint accounts, and husband's salary.

Overall, the trial court accepted husband's version of events rather than wife's. In doing so, the trial court expressly found that husband's testimony was more credible than wife's, noting that, although "[wife's] testimony, unless wholly corroborated, was generally not worthy of belief, . . . [husband's] testimony, though uncorroborated, [was] generally credible." The court further observed that wife's "demeanor and fencing manner of testifying, her un-denied misrepresentations made at the beginning of the marriage, and the content of her testimony in light of the other evidence, all are material factors in the determination that [wife's] trial testimony was unreliable."

On appeal, we "do[] not retry the facts, reweigh the preponderance of the evidence, or make [our] own determination of the credibility of witnesses." Moreno, 24 Va. App. at 195, 480 S.E.2d at 795. Here, the trial court determined that the proceeds from the sale of husband's stock options were primarily used to purchase the South Carolina property and the SeaRay boat. In making this factual determination, the trial court expressly found husband's testimony more credible than wife's. We will not disturb that credibility finding on appeal.

Although the trial court generally believed husband's testimony rather than wife's, the court also recognized that, in addition to the proceeds from the sale of the stock options, money from wife's separate account could have been used when the parties purchased the South Carolina property and the SeaRay boat. However, wife's evidence was insufficient to prove, by

- 15 -

a preponderance of the evidence, that an identifiable portion of her separate funds was used to purchase either the SeaRay boat or the South Carolina property. As we have noted, "if a party chooses to commingle marital and non-marital funds to the point that direct tracing is impossible, the claimed separate property loses its separate status." Rahbaran, 26 Va. App. at 208-09, 494 S.E.2d at 141 (internal quotations omitted). Here, wife failed to produce financial records or other documentation sufficient to trace an identifiable portion of the purchase price to an expenditure of her separate funds.[4] Because any money that might have been taken from wife's separate account was therefore hopelessly commingled with marital funds, the trial court did not err when it classified these assets as marital property. Cf. Barker v. Barker, 27 Va. App. 519, 533, 500 S.E.2d 240, 246 (1998) ("[I]t is clear that in the absence of sufficient evidence establishing the identity of separate funds throughout [] multiple investments and withdrawals, the asset in question must be deemed marital.").

Because wife failed to produce evidence sufficient to overcome the presumption that the South Carolina property and the SeaRay boat were marital property, we affirm the trial court's classification of these assets.

### 3. The Morgan Stanley Stock Accounts

In her initial brief on appeal, wife presents a two-sentence argument on this issue, as follows:

> It was undisputed that funds in the Morgan Stanley Dean Witter account *in the Wife's name only* were her separate funds, traceable

---

[4] On appeal, as proof that her separate funds were used to purchase these assets, wife asserts that husband repaid $585,000 into wife's separate "accounts." According to the record, however, husband actually testified that he paid $585,000 into the money market account – one of the jointly-titled Morgan Stanley accounts – rather than into wife's separate account. Specifically, husband testified that the $585,000 deposited into the money market account was intended to repay the collateralized loan from Morgan Stanley as well as to reimburse stock trading losses incurred by wife. The trial court found, and wife has not disputed, that the money market account is a marital asset, not a separate asset.

to her pre-marital assets. Accordingly, the Trial Court erred in classifying this account as marital property.

(Emphasis added). However, in footnotes 10 and 15 of the letter opinion, as well as in its final decree, the trial court expressly found that the only Morgan Stanley account titled in solely the wife's name (the "Campbell account") "is [wife's] separate property which is not subject to equitable distribution." Accordingly, this assignment of error is without merit.

In her reply brief, however, wife argues that the trial court erred in classifying a different, *jointly-titled* Morgan Stanley account (the "Rohrer account") as marital property, reasoning that "Husband admitted he never put any marital funds in that account." Wife explains that she "misspoke" in the opening brief "when she indicated the Rohrer account was titled in her name only." We note that wife never indicated, either in her opening brief or in her assignments of error, which of the three Morgan Stanley accounts she was discussing and that this confusion could have been avoided in its entirety had she done so. We further note that wife's own error has deprived husband of the opportunity to substantively address the issue. We therefore conclude that wife's failure to properly present the issue of the classification of the Rohrer account precludes us from considering it on appeal. See Rule 5A:20(e).[5]

## B. Distribution of the Marital Estate

In reviewing an equitable distribution award on appeal, "we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances presented in each case." Artis v. Artis, 4 Va. App. 132, 137, 354 S.E.2d 812, 815 (1987); see also Gilman v. Gilman, 32 Va. App. 104, 115, 526 S.E.2d 763, 768 (2000). Also, "[t]he court need not quantify

---

[5] We note that, in her exceptions to the final decree, wife did object to the classification of "Morgan Stanley Account 637 04392 016" – the Rohrer account – as marital property. But even though wife preserved her objection to the classification of the Rohrer account, she has failed to adequately present the issue to this Court for consideration on appeal.

or elaborate exactly what weight was given to each of the factors." Taylor v. Taylor, 5 Va. App. 436, 444, 364 S.E.2d 244, 249 (1988). Rather, "[u]nless it appears from the record that the trial judge has not considered or has misapplied one of the statutory mandates, this Court will not reverse on appeal." Holden v. Holden, 31 Va. App. 24, 27, 520 S.E.2d 842, 844 (1999) (citing Ellington v. Ellington, 8 Va. App. 48, 56, 378 S.E.2d 626, 630 (1989)); see also Hart v. Hart, 27 Va. App. 46, 53, 497 S.E.2d 496, 499 (1998). And, on appeal, "[t]he judgment of the trial court is presumed to be correct[,] and the party who asserts the contrary is required to overcome the presumption by record proof." Broom v. Broom, 15 Va. App. 497, 504, 425 S.E.2d 90, 94 (1992).

Here, neither husband nor wife made any significant non-monetary contributions to the marriage. Husband, however, contributed substantial monetary assets to the marriage, earning more than $6.3 million in stock options and salary over the course of the marriage. Wife, by contrast, was unemployed throughout the marriage, and she contributed relatively few monetary assets to the marriage. Of the three grounds the commissioner identified as leading to the dissolution of the marriage, wife was solely responsible for one of those grounds, and jointly responsible for the other two. There were no children born during this marriage, and it was of a relatively short duration. During the marriage, wife was "largely self-absorbed, dominating, and often threatened divorce," whereas husband "was principally devoted to his work, lived modestly, and financed his wife's lavish shopping and expenditures without significant objection." Considering all of these circumstances, and for the reasons discussed in more detail

below, we hold that the trial court did not abuse its discretion in awarding husband approximately two-thirds[6] of the marital assets.

## 1. Consideration of Husband's Dissipation of Assets

Wife contends that the trial court abused its discretion by failing to adequately consider "that Husband committed Two Hundred Fifty-Nine Thousand Dollars ($259,000) of waste." The record, however, does not support wife's argument. In its letter opinion, the trial court explicitly stated that "[t]hese awards are . . . inclusive of findings that [husband] committed waste, both in the sale of the gold coins shortly before trial and dissipation of the assets from the E-Trade Account amounting to $259,000, *and assumes [wife's] entitlement to half the value of those assets*, or $129,500." (Emphasis added).[7] Contrary to wife's assertion, then, the trial court *expressly* considered husband's dissipation of marital assets, and factored that dissipation into wife's equitable distribution award. Thus, this assignment of error is without merit.

## 2. Wife's Contributions of Separate Property

Wife next contends that the trial court abused its discretion in failing to adequately account for the fact that "Wife made substantial monetary contributions of her separate property to the marriage and toward the Husband's separate debt." Wife notes that she "came into the marriage with nearly Six Hundred Thousand Dollars ($600,000) in separate funds, and that the vast majority of those funds were depleted during the marriage" and that husband "came into the

---

[6] There is some dispute as to whether the ratio of distribution should be classified as 67% to 33% or 71% to 29%. Regardless of which ratio is used, however, we hold that the trial court did not abuse its discretion in awarding husband a substantially larger share of the marital estate.

[7] In her reply brief, wife states that "[t]he trial court did NOT find, as the Husband alleges, that the Husband's violation of the *pendente lite* non-dissipation order . . . constituted waste." (Emphasis in original). Wife's repeated mischaracterization of the record below troubles us.

- 19 -

marriage with approximately Four Hundred Thousand Dollars ($400,000) in debt, all of which was retired during the marriage."

Again, wife's argument is directly contradicted by the record itself. In its letter opinion, the trial court expressly found:

> It is apparent that [wife's] premarital assets afforded liquidity to the marriage, before [husband] began receiving and cashing in his Network Solutions stock options. I also find that [wife's] stock market trading eventuated in significant but un-quantifiable losses. On balance, *I conclude that the diminution of [wife's] premarital assets is offset by the expenditure of [husband's] salary and stock options to her benefit during the marriage*.

(Emphasis added).[8] Thus, the trial court expressly considered wife's contribution of pre-marital assets when it entered the equitable distribution award.

Wife, however, relying on the quoted paragraph, contends that the trial court found that her initial contribution of pre-marital assets balanced all of husband's later monetary contributions, resulting in an equal contribution of monetary assets to the marriage. We do not accept wife's strained and rather fanciful interpretation of this language. The trial court clearly found that wife's contribution of pre-marital assets was balanced by husband's later expenditure of funds *on her behalf*, not by husband's entire contribution of $6.3 million in assets.

Because the trial court clearly considered wife's contribution of pre-marital assets in distributing the marital estate, this argument is without merit.

---

[8] The court noted that, "[i]n addition to [wife's] lack of credibility, she failed to produce evidence related to her brokerage accounts," further observing that "[t]his failure lends added credence to [husband's] testimony both (1) that his wife heavily engaged in stock market transactions and suffered huge losses and (2) that he had contributed funds from his stock option sale to cover these stock trading losses."

- 20 -

### 3. Award of Carry-Over Stock Losses to Husband for Tax Purposes

Wife next contends that the trial court abused its discretion by awarding "Husband any future tax write-offs to which the parties might be entitled." Wife reasons that "[t]his award appears not to correspond with the Trial Court's additional finding that the Wife, rather than the Husband, was responsible for the stock trading decisions which resulted in the stock losses" and that the award thereby "increased the Husband's disproportionate share of the marital estate."

Wife cites no authority for the proposition that a tax write-off should be distributed to the party responsible for that loss. Indeed, the very proposition is counterintuitive to the overall purpose of equitable distribution: to give each party a "fair" portion of the property accumulated during the marriage. See Theismann v. Theismann, 22 Va. App. 557, 564-65, 471 S.E.2d 809, 812 ("The goal of equitable distribution is to adjust the property interests of the spouses fairly and equitably."), aff'd on rehearing en banc, 23 Va. App. 697, 479 S.E.2d 534 (1996). It would be vastly inequitable to permit a party to deflate the marital estate by gambling away marital funds on the stock market, and then to grant that same party a benefit in the form of a subsequent tax write-off.

Because wife advances no further arguments in support of this assignment of error, we conclude that the trial court did not abuse its discretion in awarding husband the carry-over tax losses. See Rule 5A:20(e).

### 4. Wife's Fraudulent Inducement of the Marriage

Finally, wife contends that the trial court's equitable distribution award "is not supported by evidence in the record relevant to the statutory factors." Wife argues that, although "[t]he Trial Court made a recitation that it had considered all the factors . . . in its letter opinion, the Trial Court only discussed *some* of the factors, and the evidence related to those factors does not support the division of property and allocation of debt."

- 21 -

As wife correctly notes, in performing equitable distribution, the trial court is required to consider all the factors enumerated in Code § 20-107.3(E).  See Alphin v. Alphin, 15 Va. App. 395, 405, 424 S.E.2d 572, 577 (1992).  This requires more than a mere recitation that all of the statutory factors have been considered.  See id. at 405, 424 S.E.2d at 578.  Thus, where the trial court states without further explanation that it has considered each of the statutory factors, we "must examine the record to determine if the award is supported by evidence relevant to those factors."  Id.

Code § 20-107.3(E) requires the trial court to consider the following factors before entering an equitable distribution award:

1. The contributions, monetary and nonmonetary, of each party to the well-being of the family;

2. The contributions, monetary and nonmonetary, of each party in the acquisition and care and maintenance of such marital property of the parties;

3. The duration of the marriage;

4. The ages and physical and mental condition of the parties;

5. The circumstances and factors which contributed to the dissolution of the marriage, specifically including any ground for divorce under the provisions of subdivisions (1), (3) or (6) of § 20-91 or § 20-95;

6. How and when specific items of such marital property were acquired;

7. The debts and liabilities of each spouse, the basis for such debts and liabilities, and the property which may serve as security for such debts and liabilities;

8. The liquid or nonliquid character of all marital property;

9. The tax consequences to each party;

10. The use or expenditure of marital property by either of the parties for a nonmarital separate purpose or the dissipation of

- 22 -

such funds, when such was done in anticipation of divorce or separation or after the last separation of the parties; and

11. Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award.

As discussed above, before entering the equitable distribution award, the trial court expressly considered, *inter alia*, the monetary and non-monetary contributions of both parties, the duration of the marriage, the age of both parties, and the factors leading to the dissolution of the marriage. Indeed, wife does not contend that the trial court failed to give inadequate weight to any of the above-listed statutory factors. Rather, she contends that the trial court placed inappropriate weight on her pre-marriage misrepresentations about the number of times she had previously been married.

Code § 20-107.3(E) does not expressly list "fraudulent inducement of the marriage" as a factor that should be considered during equitable distribution. Thus, the trial court was not required by statute to give *any* weight to wife's fraudulent inducement of the marriage. Regardless, under the circumstances of this case, we hold that the court properly gave some, but not controlling, weight to wife's pre-marriage misrepresentations.[9] And, because the trial court did not abuse its discretion when it took those misrepresentations into consideration, we affirm the equitable distribution award. Cf. Barker, 27 Va. App. at 540, 500 S.E.2d at 251 (affirming

---

[9] Husband, however, contends that the trial court "gave no indication that it adjusted [wife's] award because of her fraud." We disagree. The trial court expressly stated that it was "taking into account all of the evidence" when it entered the equitable distribution award. The court also observed that it considered wife's "un-denied misrepresentations made at the beginning of the marriage" when deciding that her testimony generally lacked credibility. Thus, the record indicates both that the court was aware of wife's misrepresentations and that it took those misrepresentations into account when weighing the evidence and resolving conflicting testimony. Thus, the record does not support husband's argument that the trial court utterly disregarded wife's misrepresentations when it entered the equitable distribution award. Regardless, even if the trial court had declined to consider wife's fraudulent inducement of the marriage, this decision would not necessarily have amounted to an abuse of discretion.

equitable distribution award where "[t]he commissioner and trial court both referred to the evidence of husband's adultery, but did not explicitly base any distribution decision on husband's adultery," reasoning that "[i]n the absence of a specific finding by the commissioner or trial court that husband's adultery affected the distribution of assets, we will not presume that the court improperly relied on husband's adultery").

Initially, we agree with husband that the record supports a finding that wife induced the marriage through her fraudulent misrepresentations.[10] Specifically, husband testified that, had he known wife had already been married four times, he would not have married her. And, as the commissioner observed:

> There is a substantial difference between marrying someone with one former marriage and marrying someone with four. At the very least, the difference is important enough that the other party should have the right to know, to try to understand, and to decide whether to go ahead with the relationship. [Wife] made a material misrepresentation on her marriage certificate, and the Commissioner believes the [husband's] testimony that he did not know at the time of their marriage, and for three years thereafter, that she had more than one prior marriage.

---

[10] In this divorce proceeding, wife served husband with a "Request for Admissions" pursuant to Rule 4:11. In her pleading, wife requested, *inter alia*, that husband admit "[t]hat all of the allegations contained in the attached Motion for Judgment [that husband had filed in his separate action at law] are true and accurate." Among those allegations are statements that wife "induced [husband] to marry her through a carefully crafted scheme to defraud," that wife made various misrepresentations of fact "knowingly and intentionally, and with actual knowledge that they were false . . . for the specific purpose of misleading [husband], and to induce him to rely on them in marrying her," and that husband "reasonably and detrimentally relied upon these statements in marrying [wife]."

Husband, unsurprisingly, responded to wife's Request for Admissions by "[a]dmit[ting] that all of the allegations contained in the [] Motion for Judgment are true and accurate." Thus, despite wife's assertions to the contrary, husband's admission that the allegations contained in the Motion for Judgment were "true and accurate" establishes those allegations as true for purposes of this proceeding. See Rule 4:11(b) ("Any matter admitted under this Rule is conclusively established . . . for the purpose of the pending action only . . . .").

- 24 -

The commissioner found, and the trial court accepted, that wife's fraudulent misrepresentation was one of three factors that led to the dissolution of the marriage. Indeed, wife concedes, both in her appeal and in husband's separate appeal, that her misrepresentation factored into the dissolution of the marriage.

According to Code § 20-107.3(E), when entering an equitable distribution award, the trial court must consider both "[t]he circumstances and factors which contributed to the dissolution of the marriage," Code § 20-107.3(E)(5), and "[s]uch other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award." Code § 20-107.3(E)(11). Here, wife's misrepresentation was both a factor that may have been "necessary or appropriate to consider in order to arrive at a fair and equitable monetary award," id., and a "factor[] which contributed to the dissolution of the marriage." Code § 20-107.3(E)(5).

Fraud in the inducement of a marriage is a situation the trial court would be permitted, in its discretion, to consider under Code § 20-107.3(E)(11) "in order to arrive at a fair and equitable monetary award." As husband testified, had wife not made her various misrepresentations, there would have been no marriage, and therefore no marital estate to divide. We further note that the fact that these misrepresentations occurred before the marriage does not bar their consideration, for "[n]othing in Code § 20-107.3 limits consideration of the various subsection (E) factors to the time frame of the marriage." Floyd v. Floyd, 17 Va. App. 222, 226-27, 436 S.E.2d 457, 460 (1993) (holding that the trial court could "consider[] premarital contributions to the acquisition or maintenance of property later deemed marital property in fashioning an equitable distribution").

Also, we have noted that, although circumstances "that lead to the dissolution of the marriage but have no effect upon marital property [or] its value . . . *need* not be considered" under Code § 20-107.3(E)(5), Aster v. Gross, 7 Va. App. 1, 5-6, 371 S.E.2d 833, 836 (1988)

(emphasis added), a trial court does not automatically abuse its discretion if it takes those factors into account. As we explained in O'Loughlin v. O'Loughlin, 20 Va. App. 522, 458 S.E.2d 323 (1995), factors and circumstances leading to the dissolution of the marriage *may* be considered during equitable distribution – even if those factors have no financial impact on the marriage – as long as those factors detracted from the overall "marital partnership." Id. at 528, 458 S.E.2d at 326 (holding that long-term infidelity and abusive behavior could be considered, in the court's discretion, "under any of the factors of Code § 20-107.3"); see also Budnick v. Budnick, 42 Va. App. 823, 595 S.E.2d 50 (2004) (trial court did not err in considering criminal business activities under Code § 20-107.3(E)(1)); Watts v. Watts, 40 Va. App. 685, 581 S.E.2d 224 (2003) (trial court did not err in considering husband's adultery under Code § 20-107.3(E)(1) and former § 20-107.3(E)(10)).

Here, wife's ongoing misrepresentation had a negative non-monetary impact on the marriage. The evidence establishes not only that wife lied to husband at the beginning of the marriage, but that she continued to do so throughout the marriage. More importantly, when husband discovered in June 2001 that wife had neglected to tell him about one prior marriage, he ceased all sexual relations with wife.[11] Overall, then, wife's misrepresentation – in addition to contributing to the dissipation of the marriage – had a non-monetary, negative impact on the marriage. Thus, to the extent that trial court did consider wife's misrepresentation when it calculated the equitable distribution award, the court did not abuse its discretion.

However, we decline to hold, as husband suggests, that wife's fraudulent inducement of the marriage should act as a complete bar to receiving marital assets in an equitable distribution proceeding. Eliminating wife's equitable distribution award would, in essence, be equivalent to

---

[11] Husband did not separate from wife until he learned several months later that there were, in fact, four prior marriages.

- 26 -

declaring the marriage void *ab initio*. Because husband did not challenge the validity of the marriage in an annulment proceeding, we must assume that a valid marriage existed.[12] Thus, we cannot eliminate wife's award in its entirety. Cf. Kleinfield v. Veruki, 7 Va. App. 183, 190, 372 S.E.2d 407, 411 (1988) (holding that the trial court has no jurisdiction to fashion an equitable distribution award if the marriage is void *ab initio*).

Moreover, although divorce cases are resolved in chancery, "'[t]he many limitations, both in respect to jurisdiction and procedure, placed upon divorce suits by [] statute, differentiate the divorce case from ordinary suits in equity and render it a chancery case *sui generis*.'" Westbrook v. Westbook, 5 Va. App. 446, 455-56, 364 S.E.2d 523, 529 (1988) (quoting McCotter v. Carle, 149 Va. 584, 593, 140 S.E. 670, 673 (1927) (first alteration in original)). In other words, a chancery court exercising jurisdiction over a divorce proceeding has "limited statutory

---

[12] We note that both parties discuss at length whether fraud in the inducement of a marriage would constitute proper grounds for obtaining an annulment under Virginia law. However, issues relating to the validity and voidability of a marriage are generally determined based on the law of the jurisdiction where the marriage was celebrated, barring a conflict with Virginia's established public policy. See Farah v. Farah, 16 Va. App. 329, 429 S.E.2d 626 (1993); Kleinfield v. Veruki, 7 Va. App. 183, 372 S.E.2d 407 (1988). Here, the parties were married in Florida. Although neither party has addressed the issue, Florida law is quite clear that fraudulent inducement is not grounds for an annulment after the parties have consummated the marriage. See Adler v. Adler, 805 So. 2d 952, 953 (Fla. Ct. App. 2001) (holding that the trial court erred in granting annulment on grounds of fraudulent inducement where wife "stated to [husband] that she had been married two times," she "was actually married four times, and all of those marriages ended by divorce," she "also misrepresented the number of previous marriages on her marriage application with the state of Florida," and husband testified that "he would not have married [wife] had he been aware of her actual marital history," reasoning that "'it is established law that one who has become a party to that ceremony by fraud of the other party may secure annulment [only] if the marriage has not been completed by sexual intercourse'" (quoting Rubenstein v. Rubenstein, 46 So. 2d 602, 603 (Fla. 1950))); see also Tsapelas v. Tsapelas, 69 So. 2d 315, 316 (Fla. 1954) (chancellor did not abuse his discretion in declining to annul a marriage where wife fraudulently induced marriage by failing to disclose that she had tuberculosis); Savini v. Savini, 58 So. 2d 193 (Fla. 1952) (affirming denial of annulment of grounds of fraud based on concealment of prior criminal history, reasoning that the parties had already consummated the marriage); Rubenstein v. Rubenstein, 46 So. 2d 602, 604 (Fla. 1950) (noting that "lack of consummation is a prerequisite to the annulment of a marriage on the ground of fraud").

jurisdiction." Id. For this reason, traditional equitable defenses – such as "unclean hands" – are unavailable when asserted in the context of an equitable distribution proceeding. See id. at 457, 364 S.E.2d at 530. Permitting husband to argue that wife is not entitled to an equitable distribution award because of her fraudulent inducement of the marriage would be equivalent to reviving fraud as a defense to equitable distribution, thereby thwarting the "purpose and intent of Code § 20-107.3." Id. at 457-58, 364 S.E.2d at 530.

Finally, we note that wife's equitable distribution award, which totaled approximately $800,000 when combined with her separate property, is not significantly greater than the $600,000 in pre-marital assets that she contributed to the marriage. Considering that husband's award of approximately $1.3 million was significantly in excess of his pre-marital assets, wife did not, as husband contends, "profit [] handsomely from her fraud." Although wife recognized a net gain in assets, this gain was not so overwhelming as to signal an abuse of discretion.

### III. CONCLUSION

In determining an equitable distribution award, the trial court must make "delicate and difficult judgments," Bentz v. Bentz, 2 Va. App. 486, 490, 345 S.E.2d 773, 775 (1986), and "weigh[] the many considerations and circumstances that are presented in each case." Klein v. Klien, 11 Va. App. 155, 161, 396 S.E.2d 866, 870 (1990). It is precisely "because rights and interests in marital property are difficult to determine and evaluate and competing equities are difficult to reconcile" that "the chancellor is necessarily vested with broad discretion in the discharge of the duties the statute imposes." Smoot v. Smoot, 233 Va. 435, 443, 357 S.E.2d 728, 732 (1987). Considering all of the circumstances of this case, we hold that the trial court did not err either in classifying the marital property or distributing the marital estate. Thus, we affirm the judgment of the trial court.

Affirmed.