UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Alston, Chafin and Senior Judge Annunziata
Argued at Alexandria, Virginia

JENNIFER HUTCHINS ALLEN

MEMORANDUM OPINION[*] BY
v.       Record No. 0562-16-4        JUDGE ROSEMARIE ANNUNZIATA
FEBRUARY 28, 2017

GEOFFREY B. ALLEN

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Burke F. McCahill, Judge

Thomas K. Plofchan (Jennifer M. Guida; Westlake Legal Group, on
briefs), for appellant.

David L. Ginsberg (Anne B. Robinson; Cooper Ginsberg Gray,
PLLC, on brief), for appellee.

Jennifer H. Allen (wife) appeals a final decree of divorce.  Wife argues that the circuit court

erred by (1) "classifying as hybrid property, post-separation payments received by Geoffrey

Allen [husband] in connection with the pre-separation sale of ZipList, LLC [ZipList] stock, a

marital property;" (2) "applying a coverture fraction to the ZipList proceeds because (a) they

were clearly marital as a matter of contract and (b) they were not a retirement asset, and therefore

not subject to the coverture fraction;" (3) "not finding an alternate valuation date for the ZipList

proceeds, despite the Court's finding that marital assets were comingled with separate funds and

[husband] did not trace those assets;" (4) "not finding waste by [husband] of the ZipList proceeds,

despite the Court's finding that marital assets were comingled with separate funds and [husband] did

not trace those assets;" (5) "determining that the Stock Purchase Agreement included a 'carve out'

for [husband], despite the absence of any terms to that effect in the Stock Purchase Agreement

related to the ZipList sale;" (6) "allowing Beth Eason to testify regarding the ZipList sale and a

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

related demonstrative spreadsheet, as Ms. Eason had no personal knowledge of the specific details of the sale or of the facts, figures, and formulas the spreadsheet was based on;" (7) "relying on Ms. Eason's testimony when determining the character of the ZipList sale proceeds;" (8) "giving [husband] credit for payments on marital debt without receiving any evidence to establish that [husband] paid the marital debt with separate funds;" (9) "distributing the marital property by awarding [husband] a significantly larger portion of the marital estate than [wife], despite the Court finding that a marriage is a partnership;" (10) "failing to award spousal support based on [wife's] needs established by the parties' standard of living to which [wife] was accustomed to during the marriage, and [husband's] ability to pay;" (11) "determining that [wife] knowingly, intelligently, and voluntarily waived her Constitutionally-guaranteed right against self-incrimination by [wife's] answering a general question regarding faithfulness and dutifulness;" (12) "requiring [wife] to respond to questions regarding [wife's] sexual relationship with another person despite [wife's] invocation of her Constitutionally-guaranteed right against self-incrimination;" and (13) "considering [wife's] alleged adultery when making its equitable distribution and spousal support awards." For the reasons stated below, we find no error and affirm the decision of the trial court.

BACKGROUND

"When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 834 (2003) (citations omitted).

Husband and wife married on August 28, 1999, and one child was born of the marriage in 2004. In late 2008 and early 2009, husband developed the concept for ZipList, a mobile application that allowed users to add recipe ingredients to a shopping list. In 2009, he attracted investors for the company, and in 2010, he launched ZipList.

On April 2, 2012, husband sold ZipList to Advance Magazine Publishers (Conde Nast). The terms of the sale were specified in a Stock Purchase Agreement (SPA). Pursuant to the terms of the SPA, husband received payments for the sale of his stock at the closing in 2012 and on the anniversary of the sale in 2013, 2014, and 2015. As part of the sale, husband entered into an employment agreement with Conde Nast, for which he was separately compensated, and he agreed not to compete with Conde Nast or solicit employees. He also served as ZipList's Sellers' Representative. Husband satisfied the majority of these conditions after the parties separated on April 15, 2013.

Subsequently, the parties executed a separation agreement in which they agreed that either party could seek a divorce on a no-fault basis only and also executed a custody and visitation agreement. After wife filed a complaint for divorce, the parties entered into a consent *pendente lite* order, which stated, in pertinent part, that husband agreed to pay wife $7,000 per month for spousal support. On March 19, 2015, wife filed a motion for an alternate valuation date for the ZipList stock payments received after separation.

In the course of a four-day hearing beginning on April 7, continuing on August 25 and 26, 2015, and concluding on February 11, 2016, the parties presented evidence and argument relating to equitable distribution, spousal support, and attorney's fees. On February 22, 2016, the circuit court issued its ruling from the bench in which it classified all the property, including the ZipList stock payments, declaring them to be hybrid property, and used a coverture fraction to determine the marital share of the ZipList stock proceeds. It valued and then distributed all the property after considering the Code § 20-107.3(E) factors. The circuit court awarded wife $3,400 per month in spousal support and $25,000 in attorney's fees and costs. On March 4, 2016, the circuit court entered the final decree of divorce, and this appeal followed.

ANALYSIS

*I. Classification of the Stock Purchase Proceeds*

On appeal, "decisions concerning equitable distribution rest within the sound discretion of the trial court and will not be reversed on appeal unless plainly wrong or unsupported by the evidence." Wright v. Wright, 61 Va. App. 432, 450, 737 S.E.2d 519, 527 (2013) (quoting McDavid v. McDavid, 19 Va. App. 406, 407-08, 451 S.E.2d 713, 715 (1994)). "Because the trial court's classification of property is a finding of fact, that classification will not be reversed on appeal unless it is plainly wrong or without evidence to support it." Id. at 451, 737 S.E.2d at 528 (quoting Ranney v. Ranney, 45 Va. App. 17, 31-32, 608 S.E.2d 485, 492 (2005)).

Wife contends the circuit court erred in classifying the ZipList stock purchase proceeds as hybrid and in applying a coverture fraction to determine which portion of the proceeds was marital. Wife argues that, despite the extended payments of the ZipList proceeds of sale over several years, the proceeds were marital property because husband created ZipList and sold it during the marriage. Husband contends the circuit court correctly classified the ZipList deferred payments based on the premise that the portion earned during the marriage constituted marital property and the portion earned post-separation constituted his separate property.

Husband was a shareholder and key employee of ZipList, which he developed in late 2008 and early 2009. He built the product, raised the needed capital, marketed the business, and recruited the ZipList team.

ZipList was sold to Conde Nast in 2012. Husband's involvement in the sales process included courting and negotiating with multiple possible buyers, negotiating the stock sales price as well as the terms of sale, and dealing with the legal, technological, and investment issues in preparation for the sale. Throughout the process, husband continued to work on building the company and managing his team.

- 4 -

The closing for the ZipList sale was held on April 2, 2012. Conde Nast agreed to pay fixed sums to husband in exchange for his ZipList shares. The sale was structured to provide payment of a portion of the agreed purchase price for the stock at the closing of the sale, and deferred payments for the remaining portions of the purchase price.[1] The SPA required the husband to be employed "on the date that a Sellers Deferred Purchase Price and an Employee Deferred Purchase Price payment is to be made in order to qualify to receive [his] share of such payments;" otherwise, the payments would have been forfeited and Conde Nast would have had no obligation to make those payments to any other person.[2] The SPA also contained provisions against competition and against solicitation of employees.[3]

---

[1] The Employee Shareholders Deferred Purchase Price is defined in the SPA as "the amounts payable to the Employee Shareholders on the first, second, and third anniversary of the Closing pursuant to Sections 2.01(b)(ii) (iii)and (iv) of this Agreement." Annex II of the SPA lists the payment schedule for all of the sellers, including the outside shareholders and the employee shareholders. Annex III of the SPA lists the schedule for additional payments made to the employee shareholders. Husband was an employee shareholder.

[2] Section 2.03, titled Employee Shareholder Payments, provides:

> Notwithstanding anything to the contrary contained herein, unless an Employee Shareholder's employment is terminated by the Company or Purchaser without Cause or such Person resigns from the Company or Purchaser for Good Reason, dies or becomes permanently disabled, that Employee Shareholder must be employed by the Company or Purchaser on the date that a Sellers Deferred Purchase Price and an Employee Deferred Purchase Price payment is to be made in order to qualify to receive that Person's share of such payments. If an Employee Shareholder is not eligible to receive a Sellers Deferred Purchase Price payment and Employee Shareholder Deferred Purchase Price payment by reason of having ceased to be employed by the Company or Purchaser other than for the reasons specified in the preceding sentence, then the payments that would have been made to that Employee Shareholder shall be forfeited, and Purchaser shall have no further obligation to make those payments to any Person.

[3] A violation of the SPA's non-compete clause does not provide for forfeiture of the deferred payment of the Employee Shareholder Deferred Purchase Price.

At the closing, which occurred prior to the parties' separation, husband was contractually obligated to convey, transfer, assign, and deliver his shares to Conde Nast, and Conde Nast was obligated to purchase husband's shares. The aggregate purchase price for the stock sale was determined and set in the SPA, as were the times for the agreed deferred distribution of the payment. The aggregate price was comprised of a pro rata share of husband's capital stock in the business and a management carve out.

Although the book value of ZipList at the time of the sale was "essentially negative $1,996,442.21," the agreed purchase price at the time of the sale was set at $12,194,193.71. Asked to explain how he was able to obtain over $12 million from Conde Nast to purchase ZipList when it had a negative value of almost $2 million, husband responded,

> [T]his [differential in book value and sales price] is incredibly common. Almost the rule, not the exception in startup acquisitions of technology companies, have a history of negative earnings. They have forecast of future negative earnings. What they have is they have potential. They've got a strong team. They've got an underlying business plan. And what happens is that a company will look at the ability of the team, whether they believe or not in the core business model and the future productions, and they bet on the team to realize that and they're betting that they're paying for [that].

Husband testified he received a manager's carve out as a part of the agreed purchase price. He explained that a management carve out is "almost the rule and not the exception" in such transactions and explained its purpose, saying

> what it's for is when an acquiring company believes that your underlying stock position is insufficient to keep you around for a period of time. So what carveout [sic] means is they go back to the investors and they carveout [sic] a portion of what they would pay the stock and then they would put it in long-term compensation as an incentive to keep you around.

Husband's management carve out was also addressed, over objection, by Beth Ann Eason, a Conde Nast employee, described as "the lead business person" in charge of the

- 6 -

acquisition of ZipList. She initially contacted husband about ZipList and brought the idea of acquiring ZipList to the management at Conde Nast to grow its business.

Eason was involved in the discussions for endorsing the purchase price to be offered husband. According to Eason, husband received "more compensation" under the SPA than other shareholders who had identical stock options because Conde Nast wanted to make sure husband was retained for three years of employment as he was considered "the most critical employee" of ZipList. She testified that husband's skills and experience were important considerations in Conde Nast's decision to acquire ZipList. Eason stated, "It was critical that we retained [husband] and, therefore, we put the retention payments to scale up and grow over time to make sure that he was retained for the full three years of employment." She explained the carve out as "a means of retaining employees. It's a payment system that gives employees above and beyond what they would be initially receiving through their stock."

Eason further explained the importance of the non-compete provision that was made part of the SPA. She stated, "It was important to us that [husband] not be able to compete in any way with the company that we were buying because it would inhibit our ability to achieve the effective results that we were aiming for."

Eason also testified the stock purchase money husband received for his shares was not the same money he received under his employment contract, which carried an annual base salary of $325,000 with a potential annual performance bonus of $50,000.

After examining the terms of the SPA, the circuit court concluded that the stock payments were hybrid property, noting:

> There has to be consideration . . . of not only the marital effort that was contributed in the creation of this stock during the marriage that was exchanged on April 2, 2012, but also the marital effort in the form of the husband's performance of the noncompete and his employment contract up to the date of the separation on April 15, 2013 [as well as after the date of separation]. . . .

Citing the holding in <u>Dietz v. Dietz</u>, 17 Va. App. 203, 436 S.E.2d 463 (1993), the circuit court further noted the economic partnership that the Allens' marriage established ceased on the date of separation and found the payments by Conde Nast to be made after the parties' separation were part marital and part separate.

Viewing the SPA as a deferred compensation plan and considering the need to "capture the marital and nonmarital component of an asset," the circuit court applied a coverture fraction to determine the marital portion of each payment. The numerator of the coverture fraction the circuit court applied was comprised of the number of days from the date ZipList was founded to the date of the parties' separation. The denominator of the coverture fraction was comprised of the number of days from the date ZipList was founded to the date of the final payout. Based on that formula, the circuit court determined the marital component of the deferred payments and held that "about 73 percent of this asset is marital."

### A. *Court Reliance on Beth Eason's Testimony Was Not Error*

Wife argues that the circuit court erred in allowing Beth Eason to testify about the ZipList sale and a carve out provision for husband and relying on her testimony in reaching its classification of the property as hybrid. We turn first to this evidentiary issue and find no error.

Contrary to wife's arguments, Eason was qualified to testify about Conde Nast's purchase of ZipList. Eason was a Conde Nast employee and "the lead business person" in charge of the acquisition of ZipList. She initially contacted husband about the idea of a sale and brought the idea of acquiring ZipList to Conde Nast "in order to grow its business." She was involved in the discussions about the proposed purchase price of ZipList. She was familiar with the terms of the sale and with the use and application of a manager's carve out as "a means of retaining employees," describing it as "a payment system that gives employees above and

beyond what they would be initially receiving through their stock." She was also familiar with the husband's employment agreement with Conde Nast.

We find the circuit court did not err in allowing Eason to testify about the SPA, the purchase price, and manager's carve out, as well as husband's employment agreement. Since the circuit court had the opportunity to see and hear the witnesses, it could determine the weight to place on Eason's testimony. "[T]he credibility of witnesses and the weight to be accorded their testimony is a matter exclusively within the province of the trier of fact." Yopp v. Hodges, 43 Va. App. 427, 439, 598 S.E.2d 760, 766 (2004). Accordingly, the circuit court did not err in relying on Eason's testimony for information about the sale of ZipList.

### B. The Court Did Not Err in Classifying the Property as Hybrid and Applying a Coverture Fraction to Determine Which Portion Was Marital

Wife argues that, despite the payments being spread over several years, the ZipList proceeds were marital property because husband created ZipList and sold it during the marriage and that the deferred payments were not for services or work performed but for the shares sold. Husband contends he is entitled to the total management carve out amount because the deferred payments were paid only as he continued to meet all the terms of the employment agreement and the SPA.

We find no error in the circuit court's treatment of the SPA as a deferred compensation plan, an asset form subject to equitable distribution pursuant to Code § 20-107.3(G)(1). Code § 20-107.3(G)(1) provides that, "The court may direct payment of a percentage of the marital share of any pension, profit-sharing or deferred compensation plan or retirement benefits, whether vested or nonvested, which constitutes marital property and whether payable in a lump sum or over a period of time." As this Court previously stated, "[W]e find no support for the view that the legislature intended to exclude retirement plans, *or any other specific type of property*, from the overall equitable distribution scheme." Mann v. Mann, 22 Va. App. 459, 463,

- 9 -

470 S.E.2d 605, 607 (1996) (emphasis added) (citing Banagan v. Banagan, 17 Va. App. 321, 325, 437 S.E.2d 229, 231 (1993) ("When pension benefits comprise a 'portion of the pool of marital assets,' they are clearly contemplated by the 'scheme' of Code § 20-107.3, which is intended to justly distribute the 'marital wealth of the parties.'")). See also Cirrito v. Cirrito, 44 Va. App. 287, 292-93, 605 S.E.2d 268, 270-71 (2004) (the Court of Appeals found that the future wages lost pursuant to a non-compete agreement were a substitute for a salary and subject to equitable distribution); see also Luczkovich v. Luczkovich, 26 Va. App. 702, 708-09, 496 S.E.2d 157, 160 (1998) (this Court determined the equitable distribution of severance payments based on whether "the severance pay was intended to compensate the employee for efforts made during the marriage or to replace post-separation earnings").

While the form of the deferred compensation plan at issue here differs from more commonly used plans, we find no error in the trial court's threshold finding that the SPA instituted a deferred compensation plan, based on "work performed, to be paid in the future or when some future event occurs." Schuman v Schuman, 282 Va. 443, 446, 717 S.E.2d 410, 411 (2011) (quoting Black's Law Dictionary 322 (9th ed. 2009)). The stock at issue was acquired and sold during the marriage, the stock's purchase price was based on husband's work, and, while the sale provided an initial payment of the proceeds to be made, a substantial portion of the proceeds of sale was to be deferred pursuant to the SPA.

We also find no error in the trial court's conclusion that, based on the SPA, the effort husband contributed to the creation of the stock during the marriage, as well as husband's performance of the SPA's non-compete and employment provisions of the SPA up to and post separation on April 15, 2013, comprised of the consideration for the SPA and in the trial court's classification as hybrid and not marital. It is clear from the language of the SPA that, in the absence of husband's efforts to remain employed and not compete with Conde Nast after the

- 10 -

acquisition of ZipList, the deferred payments would have been forfeited. As established by the Supreme Court of Virginia in Schuman, the classification of a marital asset pursuant to Virginia's equitable distribution scheme is made at the time of acquisition, and "the date of vesting is not, by itself, dispositive of whether the deferred compensation is marital or separate property." Id. at 447, 717 S.E.2d at 412.

In Schuman, Mary Schuman received a salary, as well as "compensation in the form of vesting stock . . . , stock options, and a Special Recognition Stock Award . . . ." Id. at 445, 717 S.E.2d at 410. The Supreme Court of Virginia held the trial court erroneously classified Schuman's stock awards as her separate property "based solely on the date of vesting." Id. at 448, 717 S.E.2d at 412. The Supreme Court found the stock awards were a form of deferred compensation, defining deferred compensation as "[p]ayment for work performed, to be paid in the future or when some future event occurs." Id. at 446, 717 S.E.2d at 411 (quoting Black's, supra, at 322). Based on that definition, the Court further found that "the stock awards were payment for work already performed as well as the work Mary performed until the date of vesting." Id. "[S]tock options, like retirement benefits, are acquired when they are earned, and not at the time of receipt, vesting or exercise." Id. at 447, 717 S.E.2d at 412 (quoting 2 Brett R. Turner, Equitable Distribution of Property 292 (3rd ed. 2005)). In reaching its decision, the Court noted, "The inclusion of the phrase [in Code § 20-107.3(G)(1)] 'whether vested or nonvested' clearly indicates that the date of vesting is not, by itself, dispositive of whether the deferred compensation is marital or separate property."[4] Id.[5] The Supreme Court adopted this

---

[4] The Virginia Supreme Court further limited this Court's holding in Shiembob v. Shiembob, 55 Va. App. 234, 685 S.E.2d 192 (2009), to the facts of that case. Id. at 447 n.5, 717 S.E.2d at 411 n.5.

[5] Code § 20-107.3(G)(1) specifically states that the "court may direct payment of a percentage of the marital share of any pension, profit-sharing or deferred compensation plan or

- 11 -

Court's analysis in <u>Dietz v. Dietz</u>, 17 Va. App. 203, 436 S.E.2d 463 (1993), as establishing the "proper treatment of deferred compensation for marital share purposes" and that deferred compensation plans should be treated as pensions or other retirement benefits. <u>Id.</u> at 447-48, 717 S.E.2d at 412.

In light of the foregoing, we conclude the circuit court properly treated the Conde Nast payments as a form of deferred compensation. The record also supports the trial court's finding that the husband's deferred payments from the stock sale were earned by husband's work, performed both during the marriage and after the parties' separation, up until the date of the final payout. Accordingly, we find no error in the circuit court's classification of the ZipList proceeds as hybrid property.

Furthermore, we find that the circuit court did not err in its application of a coverture fraction to determine the portion of marital property in the proceeds.

> Under Virginia law, it is well established that the marital portion of a defined benefit plan is distinguished from the separate portion by the application of a fraction, the numerator of which represents the total time the pensioner is employed during the parties' marriage, and the denominator of which represents the total time the pensioner is employed through the date of retirement. The fraction diminishes the marital share in relation to the number of years that pre- and post-marital contributions are made. Thus, as applied, the fraction effectively excludes from the marital share the income earned by pre- and post-marital contributions to the pension.

<u>Mann</u>, 22 Va. App. at 464-65, 470 S.E.2d at 607-08 (internal citations omitted).

In <u>Wright</u>, 61 Va. App. at 455, 737 S.E.2d at 530 (citing <u>Schuman</u>, 282 Va. at 448, 717 S.E.2d at 412), this Court recognized that the Supreme Court of Virginia stated that coverture fractions could be used for retirement plans other than pensions. Therefore, since the circuit

---

retirement benefits, whether vested or nonvested, which constitutes marital property and whether payable in a lump sum or over a period of time."

- 12 -

court correctly treated the stock payments as a form of deferred compensation, the circuit court did not err in applying a coverture fraction.

## II. Alternate Valuation Date and Waste

Wife argues that the circuit court erred in holding that husband did not waste the stock payments he received. She contends the circuit court should have applied an alternate valuation date to determine the value of the stock payments to be divided.

> The court shall determine the value of any such property as of the date of the evidentiary hearing on the evaluation issue. . . . Upon motion of either party made no less than 21 days before the evidentiary hearing the court may, for good cause shown, in order to attain the ends of justice, order that a different valuation date be used.

Code § 20-107.3(A).

"On appeal, we review the court's determination of a valuation date for abuse of discretion." Wright, 61 Va. App. at 463, 737 S.E.2d at 534 (quoting Thomas v. Thomas, 40 Va. App. 639, 647, 580 S.E.2d 503, 506 (2003)). This Court explained that an "alternate valuation date may be necessary due to the dissipation of marital assets by one of the spouses after the separation of the parties." Id. at 464, 737 S.E.2d at 534.

> [T]he burden is on the party who last had the funds to establish by a preponderance of the evidence that the funds were used for living expenses or some other proper purpose. If the party is unable to offer sufficient proof, the court must value the property at a date other than the date of the evidentiary hearing so as to achieve an equitable result.

Id. at 464, 737 S.E.2d at 535 (quoting Clements v. Clements, 10 Va. App. 580, 587, 397 S.E.2d 257, 261 (1990)).

Husband presented evidence that he used the ZipList proceeds to pay taxes and marital debt and to disburse $150,000 to each party. The circuit court found that husband's explanation for the use of the funds was credible. "It is well established that the trier of fact ascertains a

witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668 (1997) (*en banc*) (citation omitted).

Contrary to wife's arguments, the circuit court did not err in refusing to use an alternate valuation date because husband did not waste the ZipList proceeds.

### III. Waiver

In her eighth assignment of error, wife argues that the circuit court erred in giving husband credit for payments on marital debt that he paid with separate funds. In her ninth assignment of error, wife contends the circuit court erred in awarding husband a "significantly larger portion of the marital estate" than wife.

In the argument section of her opening brief, wife summarized that the circuit court considered "improper evidence, which gave improper credits to Mr. Allen and resulted in Mr. Allen receiving an inequitable distribution." She did not expand on this statement, nor did she offer any legal authority to support her statement. Accordingly, wife waived her arguments for the eighth and ninth assignments of error. See Muhammad v. Commonwealth, 269 Va. 451, 478, 619 S.E.2d 16, 31 (2005) ("Failure to adequately brief an assignment of error is considered a waiver." (citation omitted)).

### IV. Fifth Amendment

Wife argues that the circuit court erred in determining that she waived her Fifth Amendment rights against self-incrimination and requiring her to answer questions regarding her sexual relationship with another person.

During the trial, husband's counsel asked wife the following question: "Ma'am, you were a faithful and dutiful wife throughout the course of your marriage to Mr. Allen; isn't that right?" Wife responded, "I believe I was." Counsel followed up and asked wife, "You believe

you were a faithful and dutiful wife during the course of your marriage to Mr. Allen?" Wife

answered, "I believe I was, yes." Then, husband's counsel asked wife about her trips to

California. Counsel subsequently inquired, "During your trip to California, you engaged in a

sexual relationship with a gentleman named Michael Schofield; isn't that right?" Wife stated,

"I'm going to plead the fifth on that one."

Husband argued that wife had waived her right to plead the Fifth Amendment because

she previously testified that she believed that she was a faithful and dutiful wife. Wife argued

that she did not waive her right by answering a general question because there could be different

interpretations of the terms "faithful and dutiful." The circuit court disagreed with wife because

the issue of adultery was raised by husband earlier in the trial. Husband testified that wife

admitted to the affair in counseling, and then later, wife denied admitting it. The circuit court

noted that "there certainly has been no kind of confusion about the position that [husband] has

taken in the case, that he had an admission of adultery from his wife and that he was going to

pursue that as a part of this particular case." The circuit court held that wife waived her right to

claim the Fifth Amendment after stating that she believed she was a "faithful and dutiful" wife

because she "can't just dart in and out. [She] can't just claim it when it's convenient." In

addition to the fact that husband raised the issue of wife's affair earlier, the circuit court noted

that wife was "highly educated" and had "skilled counsel." Wife's counsel did not object during

husband's testimony regarding the affair, nor did counsel object to the questions about whether

she was "faithful and dutiful." The circuit court held that wife's responses to the questions about

being "faithful and dutiful" were waivers for the Fifth Amendment.

Assuming without deciding that the circuit court erred in holding that wife waived her

Fifth Amendment rights, we hold that the error was harmless.

> "'[B]efore a federal constitutional error can be held
> harmless, the court must be able to declare a belief that it was

harmless beyond a reasonable doubt;' otherwise the conviction under review must be set aside." Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). "This standard requires a determination of 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Id. (quoting Chapman, 386 U.S. at 23).

Brant v. Commonwealth, 32 Va. App. 268, 278-79, 527 S.E.2d 476, 481 (2000).

In this case, the evidence proved that any error was harmless beyond a reasonable doubt because wife's testimony was cumulative. At the point in the trial when husband's counsel asked wife about her relationship with another man, husband previously had testified that wife admitted to having an affair. During her direct examination, wife denied husband's statement that in March 2013, she admitted to having an affair. Thereafter, husband further testified about wife's admission and affair. The circuit court had the information about wife's extramarital relationship without wife's detailed testimony regarding her relationship with Schofield.

The circuit court had the opportunity to see and hear the witnesses, and it found husband's testimony about the affair to be credible. "We defer to the trial court's evaluation of the credibility of the witnesses who testify *ore tenus*." Shackelford v. Shackelford, 39 Va. App. 201, 208, 571 S.E.2d 917, 920 (2002).

Furthermore, we note that during her direct examination, wife denied admitting to having an affair. Husband then had a right to explore her answer further on cross-examination.

> We acknowledge that, "the latitude permissible in cross-examination of witnesses is largely within the sound discretion of the trial court." Yet the trial court's discretion in this regard is not unfettered. Indeed, "cross-examination on a matter relevant to the litigation and put in issue by an adversary's witness during a judicial investigation is not a privilege but an absolute right[.]"

Campbell v. Campbell, 49 Va. App. 498, 504, 642 S.E.2d 769, 772-73 (2007) (quoting Basham v. Terry, 199 Va. 817, 824, 102 S.E.2d 285, 290 (1958)).

*V. Spousal support*

Wife argues that the circuit court erred in establishing her spousal support at $3,400 per month. She contends the circuit court did not consider the amount necessary for wife to maintain her upper class lifestyle that she enjoyed during the marriage, nor did it adequately take into account husband's ability to pay spousal support.

"In reviewing a spousal support award, we are mindful that the trial court has broad discretion in awarding and fixing the amount of spousal support. Accordingly, our review is limited to determining whether the trial court clearly abused its discretion." West v. West, 53 Va. App. 125, 130-31, 669 S.E.2d 390, 393 (2008) (quoting Miller v. Cox, 44 Va. App. 674, 679, 607 S.E.2d 126, 128 (2005)).

The circuit court reviewed the factors in Code § 20-107.1(E) and each of the parties' incomes and expenses. The circuit court found that "[m]any of the figures [for expenses] . . . were somewhat inflated." In addition, the circuit court examined the parties' incomes. As of the final day of the hearing, husband was no longer employed, and he had received a severance package from Conde Nast. Despite husband's current state of unemployment at the time of the hearing, the circuit court considered husband's severance package and history of earnings to determine husband's monthly income to be used for support purposes.

Contrary to wife's arguments, the circuit considered the parties' standard of living. It found that the parties enjoyed "an upper class standard of living" and had a "very comfortable lifestyle." Further, the circuit court noted that the parties were "amassing debt, but there was a lot of discretionary money for spending and a lot of money was spent." The circuit court explained after reviewing the factors, it considered the parties' expenses and "tried to look at what was reasonable, unreasonable." It also took into account the assets that the parties received pursuant to equitable distribution.

Considering the totality of the evidence, the circuit court did not abuse its discretion in awarding wife $3,400 per month in spousal support.

### VI. Attorney's fees and costs

Both parties have requested an award of attorney's fees and costs incurred on appeal. See O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996). On consideration of the record before us, we decline to award either party attorney's fees and costs on appeal.

### CONCLUSION

For the reasons discussed above, we affirm the circuit court's rulings.

Affirmed.