UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Huff and O'Brien
Argued by videoconference

SANDRA S. WARME

MEMORANDUM OPINION* BY
v.        Record No. 0413-20-4        JUDGE RANDOLPH A. BEALES
                                      NOVEMBER 17, 2020

WALTER H. WARME, JR.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Thomas P. Mann, Judge

Melanie Hubbard (Malinowski Hubbard, PLLC, on briefs), for
appellant.

Donne L. Colton (Donne L. Colton, P.C., on brief), for appellee.

On February 7, 2020, the Circuit Court of Fairfax County entered a final order of divorce

and an accompanying court order acceptable for processing (COAP). The final order awarded

Walter H. Warme, Jr. ("husband") a divorce from Sandra S. Warme ("wife") and addressed the

equitable distribution of the parties' property. Wife now appeals these orders, arguing that the

trial court erred when it accepted stipulations on the value of some of the property. She also

contends that the trial court erred when it classified several pieces of property as husband's

separate property. Lastly, she argues that the trial court erred in assigning her "a portion of

Husband's 'gross monthly annuity' under the Civil Service Retirement System" because it

requires wife to pay "for a portion of Husband's prior wife's survivor annuity."

_____
* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

# I. BACKGROUND

Husband and wife were married on March 3, 2012, in Arlington County, Virginia. Wife is a realtor and co-owner of a house-flipping company. Husband worked as a civil servant for the United States government for over forty-five years until he retired on September 30, 2014. He then worked part-time for AgriSmart, Inc. The parties separated on September 3, 2018, and were divorced on February 7, 2020.

## The Stipulations

On January 6, 2020, the parties appeared before the trial court for a hearing on the divorce and the equitable distribution. At the beginning of the hearing, the parties' attorneys presented stipulations regarding the value of some of the property at issue, including two parcels of real property acquired during the marriage.

Before the hearing could proceed further, Pamela Cave, wife's trial counsel, explained that on the previous evening, wife – against her counsel's advice – had sent an offer directly to husband's counsel. Ms. Cave told the court that she would withdraw as counsel if wife wished, but they had not had an opportunity discuss it. After the trial court allowed them time to discuss the issue privately, Ms. Cave represented to the court that she believed wife should continue *pro se*.

Before addressing Ms. Cave's continued representation of wife, the trial judge asked whether the stipulations were still valid. Ms. Cave responded that, in her opinion, they were. She stated, "I know Ms. Warme wants to challenge the values of the houses, because she's a Realtor. Although we each had an independent appraiser do the appraisals. So I told her she's free to do that if she wishes to. Although we did have two independent appraisers, and that's where we came up with the stipulations." The trial judge explained to wife that she could proceed *pro se* if she wished but warned her it would be difficult. Wife ultimately chose to have

Ms. Cave continue to represent her. The hearing proceeded, and the final order shows that the trial court accepted and relied on the stipulations in doing the equitable distribution.

The Miles Court Property

Husband and wife purchased a property on Miles Court in Woodbridge, Virginia on August 30, 2012, to use as an investment property. Initially, the property was purchased in husband's name, but on April 16, 2013, he executed a deed putting the property in both of their names. During her testimony, wife acknowledged that husband "put some money down" for the house. When asked directly about the source of the money, she stated, "I think it's from Mr. Warme['s] account. And part of it is from -- not all but part of it's from his separate account." However, she also claimed that she contributed to the down payment and the closing costs with the commission she earned as a realtor involved with the transaction.

Husband testified that he purchased the property in his sole name using premarital funds to make the approximately $37,000 down payment – $4,000 from his savings account and $33,000 from his money market account. On cross-examination, husband agreed that he had added wife as an account holder on these accounts after the marriage and that her name was on the accounts at the time he purchased the house. Husband testified that he retitled the Miles Court property in both of their names on April 16, 2013, in the event that one of them were to pass away and that he did not intend to give an interest in the home to wife. He also stated that he paid the mortgage payment with the rental income earned from the property.

The trial court found that the Miles Court property was purchased by husband as an investment property only five months and twenty-seven days into the marriage in his sole name "using pre-marital savings to make the down payment." The trial judge also found that when husband retitled the property, he was not making a gift and that husband's action was taken "in

- 3 -

case one of them died." The trial court awarded husband $133,214, the stipulated total equity in the home.

## The Saint Elliott Court Property

The Saint Elliott Court property was purchased on August 7, 2015. It was titled in both parties' names and used as their marital home. Wife testified that she contributed to the purchase of the property. Husband testified that he put down $98,143.97 on the home and that he financed part of the purchase price through a loan that he later paid off with $143,006.66 from the proceeds of the sale of the house he lived in before the marriage. Husband testified that the $98,143.97 down payment came from a combination of a $61,200.22 payment from his Thrift Savings Plan ("TSP"), which he received on April 14, 2015, and a $64,876.96 payment he received from the federal government on March 2, 2015. He stated that the March 2, 2015 payment was partly made up of a $50,000 bonus he received by accepting an offer from the federal government to retire in 2014 and that he thought that the remaining balance ($14,876.96) of that payment was accrued sick leave. On cross-examination, husband admitted that portions of those payments "did accrue for three years" of the marriage.

The trial court found that the total equity in the property was $297,391 and that the down payment of $98,143.97 and the $143,006.66 he contributed from the proceeds of selling his premarital home both came from husband's separate property. Therefore, the trial court awarded husband $241,150.63 as his separate property and found that the remaining equity in the home – $56,240 – was marital and awarded each party one-half of that $56,240.

## AgriSmart, Inc. Stock

During the marriage, husband made two purchases of stock in AgriSmart, Inc. He purchased 100 shares for $25,000 on October 28, 2014, and made a second purchase of another 100 shares for an additional $25,000 on April 1, 2015. Husband testified that the first $25,000

was funded by a payment of $30,516.23 he received from the federal government on October 9, 2014. Husband testified that he did not "know everything that was in that check" but that he thought it was for annual leave and possibly sick leave that he had accrued in his federal government employment and that he had saved up since the early 1980s. He testified that the $25,000 for the second purchase of AgriSmart stock on April 1, 2015, came from the $64,876.96 payment on March 2, 2015. In his closing arguments to the trial court, husband's counsel conceded that the evidence failed to show that the first 100 shares were purchased with his separate money and, therefore, that those shares must be considered marital and divided between husband and wife. He argued that the second 100 shares, however, were husband's separate property.

The trial court found that both stock purchases were made from husband's separate property. The trial judge held, "Both disbursements represent payments from husband's civil service pay and benefits, which are his sole and separate property."

<u>Civil Service Retirement System Pension</u>

Husband worked for the federal government for over forty-five years and had the right to receive a pension under the Civil Service Retirement System (CSRS). Husband's first wife was awarded a survivor benefit from husband's pension. Husband and wife here stipulated that the marital portion of husband's pension (in this marriage) was 5.6%. The trial court awarded wife 2.8% of husband's gross monthly annuity, her portion of the marital share. The COAP states, "[Wife] is hereby assigned 2.8% of the [husband's] gross monthly annuity under CSRS. This award is subject to and shall be determined after all deductions for [husband's] former spouse under this Court's *Court Order Acceptable for Processing* dated January 5, 1999, which Order shall remain in full force and effect."

## II. ANALYSIS

### A. The Trial Court's Acceptance of the Stipulations

In her first assignment of error, wife contends, "The trial court erred by accepting 'Stipulations' signed by Wife's counsel at the commencement of trial concerning the fair market value of real property despite the fact that Wife's counsel acknowledged on the record that Wife did not agree to the values assigned to the real property." Wife contends that she did not authorize her trial counsel to stipulate to the values of the Miles Court and Saint Elliott Court properties and that "it was improper for the trial court to accept those stipulations given her lack of assent." Wife submits that this assignment of error was preserved when her trial counsel informed the court that she wanted to challenge the values of the real property. She also asks that this Court apply the ends-of-justice exception to Rule 5A:18 if it concludes the assignment of error was not preserved.

Contrary to wife's contentions, we conclude that wife did not preserve this assignment of error, and we further conclude that the ends-of-justice exception does not apply. Pursuant to Rule 5A:18, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18. "To avail [herself] of the ends of justice exception, [wife] must 'affirmatively show that "a miscarriage of justice [has] occurred, not . . . that a miscarriage might have occurred."'" D'Ambrosio v. D'Ambrosio, 45 Va. App. 323, 340 (2005) (third alteration in original) (quoting Brown v. Commonwealth, 8 Va. App. 126, 131 (1989)).

Although the trial court was initially informed that wife might want to testify about the properties' values, that statement was then negated by wife's later decision to proceed with Ms. Cave as her counsel and by wife's implicit grant of authority to Ms. Cave to present the case

- 6 -

as Ms. Cave deemed correct and appropriate. After Ms. Cave explained that she thought she should withdraw, the judge told wife that she had two options: to allow Ms. Cave to represent her or to proceed *pro se*. While wife deliberated, she asked the judge if she could object to Ms. Cave's presentation if she chose to proceed with her as counsel. The trial judge responded, "No, ma'am. That's your lawyer. And you - - you cannot have a conflict with your lawyer during the course of a trial." Therefore, when wife elected to have Ms. Cave proceed as her attorney, she also implicitly granted Ms. Cave the authority to make trial decisions, including the decision to agree to the stipulations. See Snyder-Falkinham v. Stockburger, 249 Va. 376, 381-82 (1995) (noting that an "attorney has full authority to act on behalf of the client in the conduct of litigation before the court, including making admissions and factual stipulations"). By granting Ms. Cave the authority to represent her at the hearing, wife waived any argument that the trial court erred by accepting the stipulations.[1] Furthermore, because wife granted Ms. Cave the authority to accept the stipulations, wife failed to show that a miscarriage of justice had occurred, and the ends-of-justice exception does not apply.[2]

---

[1] This case is distinguishable from Walson v. Walson, 37 Va. App. 208 (2001), the case on which wife relies. In that case, this Court found an attorney lacked apparent authority to sign a settlement agreement on behalf of his absent client because the record was "devoid of any verbal or nonverbal representations" by the client that would allow the other party to conclude that the client had given her attorney the authority to sign the agreement on her behalf. Id. at 216. Here, wife gave a verbal representation that Ms. Cave could represent her in the trial, knowing she could not object to Ms. Cave's trial presentation, including about the stipulations to the value of the properties.

[2] Wife argues that the ends-of-justice exception should apply in this case because, according to text messages exchanged between wife and husband's counsel (copies of which were appended to a motion to show cause filed by husband in the trial court), wife was prohibited from making objections at a February 7, 2020 hearing. However, wife failed to provide a transcript or statement of facts in lieu of a transcript for that hearing that would allow this Court to review what occurred at that hearing. "The burden is upon the appellant to provide us with a record which substantiates the claim of error. In the absence [of a sufficient record], we will not consider the point." Robinson v. Robinson, 50 Va. App. 189, 197 (2007) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1185 (1991)). Because wife

## B.  The Classification of the Property as Husband's Separate Property

On appeal to this Court, we review the evidence regarding the classification of the property in the light most favorable to husband because he was the prevailing party on these issues before the trial court.  See Wright v. Wright, 38 Va. App. 394, 398 (2002).  Wife's assignments of error two through six each address the trial court's conclusion that certain property acquired during the marriage was husband's separate property.  "Because the trial court's classification of property is a finding of fact, that classification will not be reversed on appeal unless it is plainly wrong or without evidence to support it."  Ranney v. Ranney, 45 Va. App. 17, 31-32 (2005).

"Property acquired during the marriage is presumptively marital property, unless shown to be separate property."  Id. at 32.  Under Code § 20-107.3(A)(1)(i), separate property includes "all property, real and personal, acquired by either party before the marriage."  "If, however, separate property is contributed to marital property, contributed to the acquisition of new property, or retitled in the names of both parties, and suffers a 'loss of identity,' the commingled separate property is transmuted to marital property."  Rahbaran v. Rahbaran, 26 Va. App. 195, 208 (1997) (citing Code § 20-107.3(A)(3)(d)-(f)).  In order to show that any transmuted property should retain its classification as separate property, husband had to trace the acquisition of the new property back to his separate property.  See Courembis v. Courembis, 43 Va. App. 18, 35 (2004).

---

failed to provide this Court with the transcript from that proceeding, we do not have the necessary information in the record before us on appeal to review her claim.  Furthermore, even assuming wife was prohibited from making additional oral objections at that hearing, there is no indication in the record that she was prohibited from making objections on the final order or the COAP.  Wife appears to have refused to sign those orders, and, in any event, she did not note any objections to those orders or file a motion for reconsideration with the trial court.

1. <u>The Miles Court Property</u>

In wife's second assignment of error, she contends, "The trial court erred by awarding Husband the property located at 5270 Miles Court, Woodbridge, Virginia 22193 as his separate property when Husband failed to trace his separate contribution to the purchase of the property." Wife argues that husband's testimony that he possessed the money used to make the down payment in his bank accounts prior to entering the marriage was insufficient to meet his burden of tracing because wife's name was also on the accounts.

Viewing the evidence in the light most favorable to husband, as we must because he prevailed on this issue in the trial court, we cannot say that the trial court was plainly wrong in finding that the Miles Court property was husband's separate property. In addition to husband's testimony that he used money he had in his savings account and money market account prior to the marriage to make the down payment, the record also shows that husband – despite being married – purchased the house solely in his name and less than six months into the marriage. While husband had recently added wife's name to these bank accounts, there was no evidence that she had contributed any money into the accounts. Even her testimony was that husband made the down payment and that her only contribution was her commission as a realtor involved with the purchase of the property.[3] These additional facts are credible evidence that support the trial court's conclusion that husband used his premarital funds to make the down payment.

At oral argument before this Court, wife's appellate counsel cited to this Court's opinion in <u>McIlwain v. McIlwain</u>, 52 Va. App. 644, 658-59 (2008), for the proposition that husband's

---

[3] Although wife claimed she contributed to the purchase from her realtor commission, husband's counsel argued that this contribution was irrelevant because it only "affects the seller's side of the transaction, not what the purchaser pays." The trial court accepted this argument, finding that the fact that "the wife may have contributed to the closing costs, because she acted as the realtor on the transaction, does not affect these awards or calculations." Wife does not assign error to this finding. Therefore, it is not before this Court on appeal.

testimony was insufficient to meet his burden of tracing. Wife's counsel argued that husband needed to present account statements establishing that this money was in these accounts prior to the marriage and that this money was then withdrawn from the accounts at the time of the down payment. While the Court in McIlwain noted that "[p]roving the classification of withdrawn funds . . . requires an examination of where the withdrawn funds went, when and why they were transferred, for what purpose they may have been ultimately used, as well as what contemporaneous financial records show about each," McIlwain did not establish a rule that contemporaneous financial documents must be submitted in order for a party to successfully trace the funds to a spouse's separate property. Id. at 658 (quoting Robbins v. Robbins, 48 Va. App. 466, 478-79 (2006)). In McIlwain, this Court affirmed the trial court's finding that Mr. McIlwain had failed to prove that loan receivables from two loans he made during the marriage were his separate property. Id. at 660. Mr. McIlwain had withdrawn the money for the loans from an account titled in the name of a company started during the marriage and over which both parties had signatory power. Id. at 656, 659. The evidence established that both parties had contributed their separate funds into the account and that they had intended to use the money in that account to build a new marital home. Id. at 659. The evidence also showed that they had used a significant portion of the money in the account to pay a marital tax debt. Id. Given these facts, this Court found that "the separate funds of the parties were so commingled with the marital funds as to no longer permit tracing of any separate property out of the account." Id.

The instant case is quite distinguishable from McIlwain because husband's separate funds were not "so commingled with the marital funds" as to prohibit tracing. See id. Unlike in McIlwain, the bank accounts at issue here were not jointly created by the parties during the marriage. The accounts were listed only in husband's name before he simply added wife's name

to them. Also, unlike in McIlwain, there is no evidence in this case that wife contributed any separate money into the accounts. In fact, wife's own testimony suggests that the parties were still treating the accounts as if they were husband's sole property. She stated, "I think it's from *Mr. Warme*['s] *account*. And part of it is from -- not all but part of *it's from his separate account*." (Emphasis added.) Therefore, the trial court could have inferred that, less than six months after the parties were married, the account still contained husband's separate funds. Furthermore, the trial court could make a finding of fact that husband could accurately testify as to the amount of separate funds he had in the account before the marriage. In addition, husband's choice to put the Miles Court property solely in his name supports the trial court's conclusion that it was purchased with husband's separate funds. Finally, husband testified that he later put this property in both names so that, if one of them passed away, it would transfer easily to the other but that he had no intent to gift part of this property to wife. Consequently, there is plenty of credible evidence in the record that supports the trial court's finding of fact that the Miles Court property was husband's separate property.

## 2. The Saint Elliott Court Property

In assignment of error three, wife argues that the "trial court erred by awarding Husband as his separate portion of 2752 Saint Elliott Court the down payment of $98,143.97 when Husband failed to trace his separate contribution to the down payment."

In its ruling from the bench, the trial court made the following statements about the real property purchased during the marriage: "[I]t is clear that the husband, through his pension and other retirement benefits, supported the couple financially. And it was through those assets that the real and improved property was purchased." Presumably relying on this finding, the trial court concluded that "the down payment of $98,143.97 came from the husband's separate

- 11 -

property." The evidence, however, does not support the trial court's conclusion that husband proved that the *entire* $98,143.97 was his separate property.

According to husband's testimony, the $98,143.97 down payment on August 7, 2015, was made from the $61,200.22 he received on April 14, 2015 from his TSP account and from a portion of the $64,876.96 March 2, 2015 payment he received from the federal government. While husband's TSP was almost certainly primarily separate property as he had contributed to that account for many years as a federal employee before his recent marriage to wife shortly before his retirement, the trial court was plainly wrong in finding that the *entire* TSP was husband's separate property because that finding does not account for the small portion of the TSP that husband earned during the marriage. Husband testified that he did not retire from the federal government until September 30, 2014 – two and a half years after the date of the marriage. Husband indicated in his testimony that he contributed regularly to the TSP, and he even conceded that a portion of the TSP contributions occurred during the marriage.[4] Given husband's concession and the evidence establishing that some of the funds comprising the TSP were marital, the trial court was plainly wrong in finding that the *entire* $61,200.22 component of the $98,143.97 was husband's separate property.

The trial court's conclusion that the entire $64,876.96 payment from the federal government on March 2, 2015 – a portion of which was used to help make the down payment on the Saint Elliott Court property – was completely husband's separate property was also plainly wrong. Given that husband worked for the federal government for two and a half years of the marriage, the trial court's conclusion that the entire $64,876.96 payment was husband's "sole and separate property" simply because this disbursement from the federal government "represent[s]

---

[4] Referring to the TSP, counsel for wife asked, "But a portion of it did accrue for three years of your marriage; correct?" Husband responded, "Correct."

- 12 -

payments from husband's civil service pay and benefits," was incorrect as a matter of law. As with the TSP, husband conceded that some of the $64,876.96 accrued while the parties were married.

Wife contends that the portion of the $64,876.96 husband received as a retirement bonus – $50,000 – was marital property because husband's right to receive it was acquired during the marriage. She contends that, because it was a bonus for retiring, the "bonus replaced income Husband otherwise would have earned during the parties' marriage had he not chosen to retire at that time." The record supports wife's contention. Husband testified that $50,000 of the $64,876.96, was "from early retirement." He explained, "[A]s you know in the federal government, you don't have to retire. But you -- there was a $50,000 bonus if you retired in the final quarter I believe of 2014. And so I took that offer and submitted my retirement papers and was approved for the award." Even taking the evidence in the light most favorable to husband, as we must because he was the party that prevailed in the trial court on this issue, the bonus was paid as an incentive to husband to retire in the final quarter of 2014, when the parties were still married.

In Cirrito v. Cirrito, 44 Va. App. 287 (2004), this Court found that a payment made under a non-compete agreement signed by a husband prior to the marriage was marital property because it was earned for husband's forbearance from competing during the marriage. Id. at 293. The non-compete "curtail[ed] husband's ability to earn his livelihood for one year following his termination," during which time he was married to the wife. Id. Although the agreement was negotiated prior to the marriage, "[t]his livelihood, had it been earned, would clearly be marital property." Id.

The bonus at issue in this case is similar to the payment earned under the non-compete in Cirrito. The bonus was earned for husband's forbearance from further working in the federal

government during the marriage. If husband had forgone the bonus, the salary he would have earned for continuing to work in the federal government would have been marital property. Because the bonus compensated husband for earnings he otherwise would have made during the marriage, the trial court was plainly wrong in finding that the portion of the down payment that came from this $50,000 bonus was husband's separate property.

Wife also contends that husband failed to prove that the remaining $14,876.96 of the March 2, 2015 $64,876.96 payment was husband's separate property. Husband testified that the $14,876.96 "could be the saved sick leave is what I - - would be an estimate." However, husband also testified that a payment he received in October 2014 – just after he retired – for $30,516.23 may also have included payment for some accumulated sick leave that he had banked since his early years as a government employee. Because husband admitted he could only guess that this $14,876.96 payment made six months after the date of his retirement was a payment for saved sick leave – despite also testifying that the October 2014 payment immediately following his retirement may have included some of that same sick leave – husband did not meet his burden of proving that all of the $14,876.96 was his separate property. Therefore, husband failed actually to trace some of the down payment on the Saint Elliott Court property, and we remand the matter to the trial court to determine what portion of the $98,143.97 down payment can be traced to husband's separate property and what portion is marital.[5]

### 3. The First 100 Shares of AgriSmart Stock

In assignments of error four and five, wife argues that the trial court erred in awarding husband the first 100 shares of the AgriSmart stock because husband "took the position at trial

---

[5] The parties agree that the $143,006.66 that was used to pay off the loan to purchase the Saint Elliott Court property that came from husband's sale of his residence before the marriage is entirely husband's separate property, and the issue of the classification of those funds is not before us on appeal.

that those shares were marital property and should be equally divided" and because husband failed to trace the funds used to make the purchase. Wife contends that the trial court was permitted to grant only the relief requested, and here, the trial court "went beyond the limitation Husband specifically placed on his requested relief at trial."

"Courts can only grant relief requested." Irwin v. Irwin, 47 Va. App. 287, 298 n.10 (2005) (citing Wilson v. Wilson, 25 Va. App. 752, 761 (1997)). Husband testified that he used the October 9, 2014 payment of $30,516.23 to purchase the first 100 shares of AgriSmart stock. In closing argument before the trial court, husband's counsel stated as follows:

> So [husband] testified that he used that $30,000 to buy the first tranche of $25,000 worth of AgriSmart stock. But I believe the evidence fails to show exactly what portion of the $30,000. So I would argue that the first tranche of the AgriSmart stock is marital property.
>
> . . . .
>
> I'm arguing that the first purchase was marital. Give her 50 percent of that. The second purchase was separate. Give him 100 percent of that. She gets 25 percent. He gets 75 percent.

Because husband's counsel did not request that the trial court award him the first 100 shares of AgriSmart stock that husband purchased – and, in fact, requested that those 100 shares be deemed marital and split between the parties – the trial court erred in finding that those 100 shares were husband's separate property. We, therefore, reverse that decision by the trial court and direct the trial court on remand to designate those 100 shares of AgriSmart stock as marital.

### 4. The Second 100 Shares of AgriSmart Stock

Husband testified that the second $25,000 purchase of AgriSmart stock on April 1, 2015 was made using the $64,876.96 payment he received from the government on March 2, 2015. This was the same payment that he testified that he also used in helping to make the down payment on the Saint Elliott Court property. For the same reasons that the trial court erred in

- 15 -

finding that the *entire* down payment on the Saint Elliott Court property was husband's separate property, the trial court erred in finding that the second 100 shares of the AgriSmart stock that he purchased was entirely husband's separate property. Therefore, we also reverse the trial court on assignment of error six and remand for the trial court to determine what portion, if any, of the $64,876.96 March 2, 2015 payment used to purchase the second 100 shares of AgriSmart stock on April 1, 2015 was husband's separate property.

## C. Husband's Civil Service Retirement Annuity

In her seventh and final assignment of error, wife argues that the "trial court erred by assigning Wife a portion of Husband's 'gross monthly annuity' under the Civil Service Retirement System which, under the Office of Personnel Management's definition of gross annuity, will result in Wife paying for a portion of Husband's prior wife's survivor annuity." Wife did not preserve this assignment of error for appeal but asks this Court to apply the ends-of-justice exception.

"To avail [herself] of the ends of justice exception, [wife] must 'affirmatively show that "a miscarriage of justice [has] occurred, not . . . that a miscarriage might have occurred."'" D'Ambrosio, 45 Va. App. at 340 (third alteration in original) (quoting Brown, 8 Va. App. at 131). Wife has not established that the trial court's final order or the COAP contains a "clear, substantial and material" error as she has not identified any statute or case law clearly providing that it was even an error for the trial court to award wife her share of husband's gross annuity. See Herring v. Herring, 33 Va. App. 281, 287 (2000). The two cases she cites, Craig v. Craig, 59 Va. App. 527 (2012), and Recker v. Recker, 48 Va. App. 188 (2006), are not on point as they address trial courts' interpretations of pension provisions that are in settlement agreements and final orders – not the discretion of the trial court to structure the initial pension award. Consequently, because wife did not preserve this assignment of error or affirmatively show a

miscarriage of justice, Rule 5A:18 bars our consideration of this issue on appeal. Accordingly, we do not disturb the trial court's decision on this issue.

### D. Attorney's Fees

Both parties request appellate attorney's fees. This Court has discretion to grant or deny attorney's fees incurred on appeal. See Rule 5A:30(b); see also O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695 (1996). In making this determination, this Court is permitted to consider "all the equities of the case." Rule 5A:30(b)(3). After considering the record before us and "all the equities of the case," we deny both parties' requests for appellate attorney's fees. Both parties prevailed on some of the issues, and both parties presented well-reasoned arguments for their positions.

### III. CONCLUSION

In short, the trial court did not err in accepting the stipulations signed by wife's counsel. Although wife's trial counsel initially informed the trial court that wife might want to testify regarding the property values, wife waived any objections she had to the stipulations by agreeing to have her counsel continue to represent her at the hearing. The trial judge explained to wife that, if she wanted her counsel to continue to represent her, then wife could not object to her own counsel's presentation of evidence at the hearing. In effect, by stating that she wanted her trial counsel to continue representing her, wife also authorized her trial counsel to present the case in the manner counsel saw fit, including accepting the stipulations to which counsel for both parties had agreed.

With respect to the equitable distribution award, the trial court did not err in finding that the Miles Court property was husband's separate property. The Miles Court property was purchased less than six months after the parties were married and in husband's name only. Based on these facts and husband's testimony that the specific money he used (from two bank accounts he had prior to the marriage) to make the down payment was entirely his money prior to the marriage, the trial

- 17 -

judge was not plainly wrong in finding that the Miles Court property was husband's separate property because there was credible evidence in the record to support the trial judge's finding of fact.

The trial judge did err, however, in finding that the *entire* $98,143.97 husband used to make the down payment on the Saint Elliott Court property is completely husband's separate property. The $98,143.97 came from two payments to husband from the federal government that were paid to husband during the marriage, and husband conceded during the hearing that some of the funds in both payments accrued in part during the marriage. While the April 14, 2015 $61,200.22 payment from husband's TSP was mostly separate property of husband, given the many years husband had worked for the federal government before his marriage to wife, a small portion of the $61,200.22 was marital, given that husband continued to work for the federal government for two and a half years during the marriage. The March 2, 2015 $64,876.96 payment from the federal government also clearly appears to have a marital component. Of that payment, the $50,000 bonus paid to husband as an incentive for him to retire in September 2014 was paid during the marriage, and it replaced income that husband otherwise would have earned during the marriage. In addition, husband's testimony regarding the remaining $14,876.96 was speculative as to what it covered and when it accrued. The trial court was wrong as matter of law when it stated that the *entire* $64,876.96 payment was husband's "sole and separate property" simply because the payment was for "husband's civil service pay and benefits." We, therefore, reverse the trial court's decision that all of the $98,143.97 down payment on the Saint Elliott Court property is completely husband's separate property and remand the matter to the trial court to reclassify what portion of the $98,143.97 is marital property and what portion is husband's separate property.

The trial court also erred in its classification of the 200 shares of AgriSmart stock. With respect to the first 100 shares that husband purchased, the trial court erred in awarding husband

relief that he did not request. At trial, husband's counsel conceded that husband did not meet his burden of tracing the funds used to purchase this stock and stated that it was marital. Therefore, we reverse the trial court's finding that the first 100 shares of the AgriSmart stock is husband's separate property and direct the trial court to classify it as marital. For the same reasons that we have stated *supra* regarding the down payment on the Saint Elliott Court property, the trial court also erred in designating the second 100 shares of AgriSmart stock as entirely husband's separate property. We, therefore, also reverse the trial court's decision on the second 100 shares of AgriSmart stock that husband purchased and remand for the trial court to reclassify what portion of the second 100 shares is marital and what portion is husband's separate property.

Finally, given Rule 5A:18, we cannot reach wife's contention that the trial court erred in the way it awarded her one half of the marital share of husband's "gross monthly annuity." Wife never brought this argument to the trial court's attention, nor has she shown sufficient reason (i.e., an actual miscarriage of justice) for this Court to employ the ends-of-justice exception to Rule 5A:18 on appeal.

For these reasons, we affirm the trial court on assignments of error one, two, and seven, we reverse the trial court on assignments of error three, four, five, and six, and we remand the case to the trial court for further proceedings consistent with this opinion.

<u>Affirmed in part, reversed in part, and reversed and remanded in part.</u>